## In the matter of Samuel W. Jackson.

*Habeas Corpus, where party is detained in another state.* Whether a writ of *habeas corpus* will issue from the Supreme Court to a person here, to bring into this state a minor child under guardianship here, and who has been, and continues to be detained in another state, *quære*, the court being equally divided.

*Heard April 30th.    Decided May 16th.*

In the matter of Samuel W. Jackson on petition of George W. Bissell and John Hosmer, guardians, for a writ of *habeas corpus* against Samuel S. Taff.

The petition set forth that the said Samuel W. Jackson was a minor, and that petitioners were his testamentary guardians and entitled to his custody; that the said Taff had caused said minor to be carried out of the state of Michigan and beyond the jurisdiction of the courts of said state, and still continued (through his wife) to keep him out of the state after service of the writ. The respondent moved to quash and set it aside for matters appearing on the face of the petition, and especially, for the reasons that he was in effect charged thereby with a criminal offense and was called to answer thereto; and that it appeared that the said infant had been, since May, 1866, out of this state and beyond the jurisdiction of the court, and had not been restrained of his liberty within the state.

Theodore Romeyn, for the respondent, insisted on these grounds for the dismissal of the writ.

IN THE MATTER OF SAMUEL W. JACKSON.

George V. N. Lothrop, with whom was associated D. B. and H. M. Duffield, was heard for the relator and the court overruled the motion and ordered a return.

The respondent then made the following return: "that he has not the said S. W. Jackson in his custody or under his power or restraint, and that he did not have him in his custody or under his power or restraint at the time of the application for this writ, and has not had him at any time since; and he further states that he has at no time transferred the custody or restraint of said S. W. Jackson to any person."

Mr. Lothrop, for the relator, objected to the return as insufficient and moved for a further return.

Mr. Romeyn insisted that the return was sufficient; that it was in the form prescribed by the statute, (2 *Comp. L.* § 5221,) and that it was the intention of the law to allow a general form of return and denial.

Mr. Lothrop insisted that the matters alleged in the petition must be specifically answered.

The majority of the court so held and ordered the respondent to make further answer.

The defendant thereupon made a further return, setting up amongst other things that the said Samuel W. Jackson was taken out of the state by his wife in May, 1866, being before the said writ had been issued, and had never, since that time, been within the state; and that she had been duly appointed the guardian of said Jackson by the Surrogate's Court of Canada, a court of competent jurisdiction in the province of Canada West; and that the child was not, when the writ was applied for, and had not been since, and was not now under the custody or control of the respondent.

To this the relators filed a traverse, denying "that said respondent did not cause said child to be taken out of this state; that the respondent has not since such taking kept said child in the care and charge of his said wife

IN THE MATTER OF SAMUEL W. JACKSON.

absent from the state; that said respondent has no control over said child; that respondent does not support his said wife and child beyond the limits of this state, for the purpose of keeping said child from the custody of the petitioners; that the respondent did not have the said child in his custody, or under his power or restraint, when said writ issued; that he has not had said child in his custody, or under his power or restraint, at any time since; and that he did not, at the time of said return, have said child in his custody, or under his power or restraint; these petitioners deny each and singular said averments, as made and alleged in said return, to be true, and they pray the same may be inquired of by this court."

Thereupon, respondent moved to quash the writ for want of jurisdiction, upon the case made by the papers.

On the argument, Mr. Romeyn, for the respondent, made the following points:

1.  Both at common law and under the statute the writ of *habeas corpus* is confined to the relief of parties detained or restrained within the state.   It has no application to a detention beyond the limits of the state.

Such detention is an offense against the realm where it is committed, and the courts of another country can not relieve against it.

2.  The removal of the relator from the state, if unlawful, was a crime under its laws (2 *Comp. L.* §§ 5735–5740–1); punishable as such, even as a felony.

The crime against the people of the state was consummated when the child was removed.   The further offense of unlawful imprisonment in another country is not to be remedied by this writ, issuing in the name and in behalf of the people of the state; and if the removal from the state was with intent to evade the process of its courts, then such removal was punishable as a contempt.

3.  The facts in this case do not show a detention by this respondent.

4. If otherwise, the only relief in the courts of this state must be sought in equity. But,

5. The appointment of the guardian in Canada is a conclusive answer to the ruling sought by the writ, or in any form in our courts.

6. While that guardianship exists the petitioners here should go to the court in Canada and apply there for the surrender of the ward to them.

CAMPBELL J.

The question of jurisdiction presented by this motion is, whether, assuming that Taff, in May, 1866, caused the infant Samuel W. Jackson to be removed from this state, with the design of keeping him from the custody of his guardians, and has since that time been instrumental in having him detained beyond the state, this court has authority by the writ. of *habeas corpus* to compel the child, who has been all this time in other territory, to be brought back to Michigan.

If the court has such authority, and if the case set up by the relators should be made out, there can be no difference of opinion as to the propriety of its exercise. The removal is charged to have been made at a time when a decision of this court was to be given, which might, and when it was made actually did, settle the rights of the testamentary guardians to have the child under their control. If the allegations should be sustained, the respondent has been concerned in a very daring violation of law, for which he should be held to a strict account.

The gravity of the charges, and the danger which must arise if such conduct can not be reached, impose upon us the duty of considering with more than common care the question of jurisdiction, where action and refusal to act involve equally serious results.

IN THE MATTER OF SAMUEL W. JACKSON.

Under the Constitution of Michigan the Supreme Court has jurisdiction to issue the writ of *habeas corpus*, and various other original and remedial writs, but in all other cases its authority is merely appellate. *Art.* 6, § 3. It is not doubted that the issuing of a writ of *habeas corpus*, when directed to bring up the body of a person not held under process, is an exercise of original and not of appellate jurisdiction. Inasmuch as the power is given in general terms, it must be held to include any recognized jurisdiction exercised through this writ heretofore, at common law as well as by statute, unless there is some inconsistency in the claim, which has not been pointed out. It is also plain that where the original jurisdiction of the court is the exception, and the appellate jurisdiction is the rule, the former can not be enlarged beyond its existing bounds.

The *habeas corpus* act of this state differs from the original English statute, in not being confined to persons held under charges of crime. Except in certain specified cases, in which the interference would be manifestly improper, the statute allows the writ, where the imprisonment or detention is "*under any pretence whatever.*" But it is also confined in its operation by the same section to persons detained "*within this state.*" — *Comp. L.* § 5210.

It is also easily seen from the statute that the attention of the legislature was directly drawn to cases like the present, where it may be supposed a design exists to evade the law. Section 5252 makes it a criminal misdemeanor to transfer the custody or change the place of confinement, with intent to elude service or avoid the effect of a writ. Section 5255 provides that when it is made to appear that a person is likely to be carried out of the state, a special warrant may issue to take such person, and, if the conduct charged is criminal, to arrest the custodian. But if the case is made

out against the latter, there is no provision authorizing anything to be done with him except to hold him to bail, or commit him in default of bail, to answer the criminal charge. — § 5258.

The statute, then, furnishes no means for reaching a case like the present; and, according to the usual rules of construction, it is fair to presume the omission was not accidental, but was based upon some adequate reason. And it can not be supposed that the possible existence of some common law application of the writ furnished any such reason, inasmuch as the statute was framed expressly to improve upon the common law, which was alleged to be deficient from the very fact that, by not compelling an immediate return, it gave parties facilities for evading the writ. This is matter of history, and is expressed in the preamble of the English statute.

The territorial statutes are all modeled in their more important features after the act of 31, Charles II. and therefore leave much to the common law. Like that statute, however, they provide expressly for cases where prisoners are sent abroad, and, instead of furnishing means for reclaiming them, only provide actions and penalties for false imprisonment. The revised statutes of 1838 do not in terms confine the operation of the writ to persons detained within the State, but the effect is the same, as the writ is in all cases required to be directed to an officer, who is thereby ordered to take and bring before the court the body of the person detained. Of course, the officer must act within his bailiwick, and the place of the imprisonment is expressly required to be set out in the application. This statute also provides in express terms for evasive transfers and removals, but only applies a specific penalty against the wrong-doer, in favor of the party aggrieved.—R. S. 1838, Part 3, Tit. 4, Ch. 3.

Any argument derived from a legislative interpretation of the law in this country would usually deserve

very little weight. The course of legislation is notoriously careless and hasty; but there are certain classes of laws, the history of which enables us to know that they have been the result of the most diligent and exhaustive scrutiny. The *habeas corpus* acts are instances of this kind. The act of 31, Charles II. was, when passed, and has been ever since, regarded as one of the greatest bulwarks of liberty. While only embracing certain kinds of detention, it was certainly intended, so far as it went, to secure to the aggrieved person every possible safeguard which such a writ could obtain. It is not conceivable that it was supposed to leave out any means of redress which had been afforded by the common law. It was framed by the best lawyers and the most determined friends of justice of the age, and it has not been found necessary since, in improving the law, to do anything more than to extend its privileges so as to cover cases of detention other than on criminal charges, and to make some very slight changes of detail in the practice. The American statutes have usually been drawn or modified by revisers, chosen for their peculiar fitness and legal learning, to present laws as perfect as circumstances would permit. The successive enactments in Michigan have been made in the light of the English legislation, and with the aid of the researches and suggestions of the revisers of Massachusetts and New York. It appears from the revisers' notes to *part* 3, *chap.* 9, *title* 1, of the New York statutes, that it was deemed unwise by them to leave anything on so important a subject open to the necessity of recourse to the common law; and they profess to have provided every beneficial security derivable from any source, as well as to have added new ones. They had in view, and provided for, the case of removal from the State. But they suggest no means for bringing the party back.

IN THE MATTER OF SAMUEL W. JACKSON.

I have not had access to the report of the Massachusetts Commissioners of 1836. The revised statutes of that state, which we followed in our revision of 1838, contained at the end of the *habeas corpus* act a clause expressly abolishing the writ *de homine replegiando*, which was a writ peculiarly adapted to do justice in cases where the prisoner had been eloigned. But it was found necessary in Massachusetts, in the year 1837 (the next year after the R. S. went into operation), to restore the abrogated remedy under the name of *Personal Replevin*, and to enact, by a new statute, the substance of the common law incidents of the old writ. (*See report of Massachusetts Commissioners in* 1858, *p.* 312.) In Michigan that writ has not been restored; and, if it had not been abolished, it may be questionable whether it would not, like other writs of replevin and private actions, have been confined to the Circuit Courts. And there can be no claim that by abolishing one writ the functions of any other become enlarged, without some legislative enactment.

It will be proper, then, to consider the Act of 31, Charles II. in. connection with the authorities, to see whether, as far as it extends, it leaves out any of the safeguards of the common law. The only point on which we need now examine it, is in respect to the persons and places subject to its operation. This is provided for by section 11, which is in these words: "And be it declared and enacted by the authority aforesaid, that a *habeas corpus*, according to the true intent and meaning of this act, may be directed and run into any County Palatine, the Cinque Ports, or other privileged places within the kingdom of England, dominion of Wales, or town of Berwick upon Tweed, and the island of Jersey or Guernsey; any laws or usages to the contrary notwithstanding." The 12th section provides

for the case of any inhabitant or resident of the kingdom of England, dominion of Wales, or town of Berwick upon Tweed, who shall be sent prisoner "into *Scotland, Ireland, Jersey, Guernsey, Tangier, or into parts, garrisons, islands, or places beyond the seas, which are or at any time hereafter shall be, within or without the dominions of his Majesty, his heirs or successors.*" For this an action is given, which is very safely guarded, and the offending parties are also brought under the pains and penalties of a *præmunire.* It will at once be noticed that this section would be a dead letter if the offenders should not be found within reach of "*any of His Majesty's courts of record,*" whose process could only be served within the realm. Yet the statute makes no mention of the issue of any writ or process to bring back the prisoners.

The islands of Jersey and Guernsey are the only places mentioned in both sections of this act, and they are the only two places concerning which it was doubted whether they formed a part of the realm of England. They originally formed a part of the Duchy of Normandy, and subsequently became a part of the English dominions, but it was said, in *Calvin's case,* that they were not parcel of the realm. 7 *Co.* 21 *A.* And *Lord Coke* says the King's writ does not run there. — 4 *Inst.* 236. *Selden,* on the other hand, says they were a part of the realm. — *Seld. Mar. Clau.* 4, 1351, *cited Comyn's Dig. "navigation," F.* 3. This question came up again in 1855, before the Court of Exchequer, in a revenue case, where Baron *Alderson* uses this language: "When Calais was under the dominion of the English crown, it was part of the realm of England. Children born there were Englishmen, and could inherit property in England; and a writ of error to the King's Bench would lie on a judgment given there. — 4 *Inst. c.* 68. It is not so with the Channel Islands."— 32 *L. & Eq.* 539 (*Shepherd v. Hills*). It has been generally conceded that the writ of *habeas corpus*

*ad subjiciendum,* runs from the chancery or King's Bench, as representing the prerogative, into those islands. *Rex v. Overton. Sid.* 386 ; *Carus Wilson's Case,* 7 *Q. B.* 984. But it is equally clear that writs not prerogative do not run there, and that the proceedings there have no resemblance to those at common law. — *In re Belson,* 3 *L. & Eq.* 49 ; *Brenan's Case,* 10 *Q. B.* 492 ; *Carus Wilson's Case,* 7 *Q. B.* 984. In *Brenan's case,* it was said by *Patteson J.* that "the law of Jersey is, in our courts, the law of a foreign country, and to be proved by evidence." — *p.* 497. In this confused state of things, removal of a prisoner into those islands might very well, until recent times, have been regarded as substantially sequestering him from all ordinary means of obtaining his liberty, or redress for its infringement. The other places named, Berwick, the counties Palatine and the Cinque Ports, were all within the realm, and it had been held from early times that the writ of *habeas corpus* would run there. — *Palmer,* 54 ; *Sid.* 431 ; *Bourne's Case, Cro. Jac.* 543 ; *Jobson's Case, Latch,* 161. In the two cases last cited, reference is made to the fact that the French possessions of the crown were regarded as in the realm, which agrees with the statement of *Alderson* B. before quoted. Scotland, Ireland, and the Isle of Man, although under the same crown, were all then regarded as separate kingdoms. *Com. Dig.* "*Ireland,*" *A.; "Navigation"* F. 2, 3 ; "*Scotland*" *A.* The Isle of Man has now become annexed directly to the realm of England, and the common law writ of *habeas corpus* probably now runs there, although it has not been expressly decided. — *Crawford's Case,* 13 *Q. B.* 613. For the former condition of affairs, see *Earl of Derby v. Duke of Athol,* 2 *Ves. sen.* 337. The statutory writ now applies to Ireland and the Isle of Man, but has never been extended to Scotland. — *Chitty's note to* 3 *Bl. Com.* 132.

It is universally admitted that there are no precedents for issuing the writ to any of the places mentioned in the twelfth section but Jersey, and that it can in no case

run beyond the dominions of what is technically the crown of England. The only disputes have been as to what countries were crown dominions. In *Rex v. Cowle*, 2 *Burr.* 834, Lord *Mansfield* states the rule, and in some loose *dicta* includes both Ireland and the Isle of Man within the crown dominions, contrary to the settled law. But he states that while there may be an abstract right in the King's Bench to issue the writ to any part of the crown dominions, he never knew the writ to issue to any places out of the realm; although, as he says, cases had arisen where such a writ would have been a very desirable remedy. — *p.* 856.

The question then arises, whether the running of this writ is determined by the situation of the person to be relieved, or by that of the persons concerned in the unlawful detention. Among all the precedents, ancient and modern, which I have been able to find, there is none which does not show the question, as to whether the writ would run into the privileged places, to have arisen concerning an imprisonment there. No point was ever made upon the service of the writ upon the wrong-doer outside of the place of imprisonment, as making any difference. And there can be no doubt that the legal purpose of the writ is to relieve from the illegal restraint, on the ground of its illegality, and on no other ground.[*] It is not a private remedy in favor of the parent or guardian, or even, except indirectly, of the prisoner himself. It is a prerogative writ, issued on behalf of the King, who is entitled to "*have an account why any of his subjects are imprisoned, and therefore no answer will satisfy the writ, to return the cause with paratum habeo corpus,*" etc. — *Bourne's Case, supra.* The exigency of the writ is to bring up the body, and there is no instance in the law where a writ requires any act to be done beyond the jurisdiction which issues it. If there are attachments and penalties, they all refer to some refusal or neglect to do

an act lawfully prescribed; and no one can maintain that if a person, to whom such a writ is directed, should do anything abroad towards complying with it, he could thereby justify himself against conflicting claims asserted in the foreign jurisdiction. A writ must spend itself in the jurisdiction which issues it; and there is no principle which can give one state a right to consider an act, done in another to an individual, as an offense against itself. If a person is unlawfully held in New York, and a person in Michigan is implicated at all, it is as an offender against New York, and not against Michigan. It is a principle of universal application in the criminal law, that the place of the wrong done, and not the place of the wrong-doer, is the *locus delicti*. The kidnapper completes his offense against the state when he removes the victim from its borders. He can no more be responsible to that state for detention abroad than for murder abroad. The private grievance is the subject of a private action. The *habeas corpus*, while practically aiding the prisoner, is professedly for the public grievance. In the cases of *The King v. Reynolds*, 6 *T. R.* 497, and *The King v. Edwards*, 7 *T. R.* 745, it was held that the court would not interfere at the instance of a master to release an apprentice who was old enough to speak for himself, and who made no complaint; because the writ was designed to protect liberty, and not to determine the right of a third person to the custody of the party. And in *Rex v. Delaval*, 3 *Burr.* 1434, this doctrine is very clearly laid down by Lord *Mansfield.* He says: "In cases of writs of *habeas corpus* directed to private persons (to bring up infants), the court is bound *ex debito justitiæ*, to set the infant free from an improper restraint; but they are not bound to deliver them over to anybody, nor to give them any privilege. This must be left to their discretion, according to the circumstances that shall appear before them."—*p.* 1436. In that case, he refused to deliver the infant to any person, but

IN THE MATTER OF SAMUEL W. JACKSON.

discharged her, and left her to go where she pleased. He refers to three decided cases for the same doctrine. And it appears that any unauthorized control, whether kind or unkind, comes within the same principle, and is treated as unlawful imprisonment. Thus, in *Rex v. Johnson*, 2 *Ld. Raym.* 1334, the infant was anxious to remain with her relatives, and reluctant to go to her guardian, yet being too young to judge for herself, the court held the custody wrongful, and allowed the legal guardian to take her. In both of the other cases cited by Lord *Mansfield*, the infant was left to her own choice; and he declares explicitly, "The true rule is, that the court are to judge upon the circumstances of the particular case, and to give their directions accordingly."

While in such cases the guardians are unquestionably entitled to be favored, unless circumstances show convincing reasons to the contrary, yet they can not be considered as parties aggrieved, nor as entitled to control the proceedings on the writ. The infant is the subject of the false imprisonment, and his detention is the grievance which concerns the public, and it can not concern any commonwealth but that where he is restrained. The remedy is *quasi* criminal, and analogous to the proceedings of conservators of the peace. The American cases take the same view of the discretion to be exercised in determining the custody of infants where the detention is unlawful. — *People. v. Mercein*, 8 *Paige*, 47; *Com. v. Harrison*, 11 *Mass.* 63; *Com. v. Hamilton*, 6 *Id.* 273; *Com. v. Hammond*, 10 *Pick.* 274; *Com. v. Addicks*, 5 *Binn.* 520; *Com. v. Robinson*, 1 *S. & R.* 353; *State v. Fraser*, *Dudley*, *Ga.* 42.

This question of locality was referred to as furnishing the ground of jurisdiction, by the Supreme Court of the United States, in 21 *How.* 523, in the case of *Ableman v. Booth*, which was the foundation of the ruling of a majority of this court in *Spangler's case.* — 11 *Mich. R.*

IN THE MATTER OF SAMUEL W. JACKSON.

298. In this. latter case, *Manning J.* concisely explains the object of the writ issued by the State as being "*to release from imprisonment, within its judicial limits, persons entitled to its protection, who are deprived of their liberty without warrant of law.*"—*P.* 309. On page 310, he speaks of the writ again, as designed "*to inquire into the legality of the imprisonment of any person deprived of his liberty within the state.*" And, on page 311, he refers to a person in custody of the United States as being beyond the reach of the state writ, as completely "*as he would be if he were not within the state.*"

These references are chiefly valuable as showing the natural inference which occurs to every one, concerning the rule of locality and the object of interference on *habeas corpus.* The able treatise of Mr. Hurd does not even allude to any question upon the subject. The only case which has been thus far discovered, in which the writ has been made a foundation for reaching persons restrained of freedom beyond the jurisdiction, is that of *United States v. Davis.*— 5 *Cranch C. C. R.* 622. There it does not appear that the application for the writ disclosed the absence of the parties. But, it appearing after the writ issued, that Davis had sent them out of the District of Columbia, he was attached until he produced two of them, the third being under arrest in Maryland. This case is entirely bald of reasons, and the most that can be said in its favor is that the judges probably decided the matter in haste, and looked more to the demerits of the respondent than to any rules of law. The present statutes regulating the power of the courts of the United States to punish contempts could not be legitimately construed to authorize such a proceeding.— *See Act of March* 2, 1831. The facts were such as to make it very desirable to deal with the wrong-doer; and if courts were allowed to devise remedies at their option, there could be no objection to following

the precedent. But it seems difficult to maintain it upon any sound principle.

I have already alluded to the fact that, in the English acts, provision is made for vindicating with great severity cases of removal of prisoners beyond the reach of *habeas corpus*, but none is devised for securing their return. The unrestrained power of Parliament could very easily have made the writ run anywhere into British possessions, except into Scotland, and could have provided compulsory means for putting the offender under such terms as would have made it desirable for him to make efforts to produce the persons restrained of liberty. But the form of the writ does not adapt it to any such indirect purpose, and it was contrary to the common law to disregard the locality of crime as an element of jurisdiction; and every false imprisonment was an indictable misdemeanor, punishable where committed.

But no such provision was necessary to obtain redress for the person aggrieved. The writ *de homine replegiando* was the remedy secured to the party for obtaining his liberty, in those cases where the remedy by *habeas corpus* was inapplicable. We have already seen that it has been restored in Massachusetts as a supplement to that. Under this writ, which was directed to the sheriff of the county where the party was taken or held, if the officer return that the defendant has eloigned the body, the plaintiff may have a capias *in withernam*, to take the defendant's body and hold it until he make return of the plaintiff's body. In such case, as in case of *habeas corpus*, the privilege of peerage can not exempt the defendant from arrest. — *Fitzh. N. B.* 66, 68. And the writ runs, as it would seem, into privileged places, not subject to the ordinary writs — as the Cinque Ports. — *Fitzh. N. B.* 67. The writ is not bailable, and bail can only be allowed by the court. The proceedings in *Designy's case* — *T. Raymond*, 474, (*also reported more at length in Showers'*

*R.* 225 *to* 232 ) — exemplify its operation in a case not unlike the present. There a boy had been spirited away to Jamaica. A return of *elongatus* being made on the writ, defendant was arrested upon a *withernam.* The court refused to release him without a payment into court of a thousand pounds, to be forfeited unless the boy was produced. It appears from the report in Shower that security was subsequently accepted in the same amount, conditioned for such production within six months, " death and perils of the sea excepted." The lad was subsequently brought in, and the sureties were discharged. — *See also* *Vin. Ab. Tit. " Homine Replegiando."*

The remedy by *habeas corpus* is so much more satisfactory, that it is not to be wondered at that the other writ should rarely be resorted to. There are no common law countries where liberty is not protected. It can not· often happen that the favorite remedy will not prove adequate. But this will not justify us in substituting it where, by law, it is not appropriate. Under a government of law it would not become the courts to set the example of usurpation. They are not in fault for affording no relief, when the power to grant it has been withheld. It may be worthy of consideration, whether the case does not come within the jurisdiction of equity. But· it would be out of place now to make any investigation on that point. If the writ of *habeas corpus* does not lie, we are precluded from any further inquiry.

I have arrived at these conclusions with regret. A criminal complaint does not afford the redress needed. It is true that the obstinacy of a party might prevent any means of obtaining an infant who has been concealed elsewhere. But coercive measures would in most cases be effectual, and I should be glad to believe we could inquire into the merits of this matter. But for the reasons given, I think the writ must be quashed.

Martin Ch. J. concurred.

In the Matter of Samuel W. Jackson.

·Cooley J.

I have not yet seen sufficient reason to doubt the power of this court to issue the present writ on the petition which was laid before us. The subject of the petition was a minor of tender years, incapable of judging and acting for himself, whose custody was sought by his legal guardians, and who, according to the petition, had been removed from this state where his residence was, apparently to avoid the process of this court, by a person who was a party to litigation before us respecting the guardianship, and who was still within the jurisdiction. The writ, if issued, would not be for the purpose of releasing the child from custody, but to subject him to the custody of those who had been adjudged by our decision to be lawfully entitled to it; but the case stood upon no different ground than if a citizen *sui juris* had been kidnapped, and removed, or enticed beyond the limits of the state, and was now confined abroad by a person resident here, and within reach of our process. The question nakedly presented, therefore, was whether we had any jurisdiction to relieve from unlawful imprisonment a person confined beyond the limits of the state, but who was one of our citizens, removed wrongfully to evade process, and for the purpose of the unlawful confinement, and whose jailer was here, and might be compelled to open his prison doors by our order, if we have power to make one. It appeared to me at the outset, that we were able to give the proper relief; and examination and reflection have only tended to confirm my first impressions.

It would be strange indeed, if, at this late day, after the eulogiums of six centuries and a half have been expended upon Magna Charta, and rivers of blood shed for its establishment; after its many confirmations, until Coke could declare in his speech on the petition of right that "Magna Charta was such a fellow that he will have no

sovereign," and after the extension of its benefits and securities by the Petition of Right, Bill of Rights and *Habeas Corpus* acts, it. should now be discovered that evasion of that great clause for the protection of personal liberty, which is the life and soul of the whole instrument, is so easy as is claimed here. If it is so, it is important that it be determined without delay, that the legislature may apply the proper remedy; as I can not doubt they would, on the subject being brought to their notice. Bounded as we are on two sides by a foreign nation with whom we are liable at any time to have such relations as will not permit us to rely upon the cordial enforcement of the usual rules of inter-state comity, we are peculiarly interested in knowing whether our laws are so defective that one of our own citizens may imprison his fellow across the border, and avow the act with impunity in our courts, while the person thus deprived of his birthright of liberty has no resource but to appeal to the justice of the foreign power, which may or may not feel an interest in his release and protection.

The argument in favor of this position at the bar seemed to be based mainly on two propositions: *First,* That the act of removing the child in the manner charged was a criminal offense, and the person guilty thereof could only be proceeded against for the crime; and, *second,* that the statutory provisions respecting the writ are applicable by their express terms only to the case of confinements within the state.

The first proposition certainly has no force. It would be a monstrous anomaly in the law if to an application by one unlawfully confined, to be restored to his liberty, it could be a sufficient answer that the confinement was a crime, and therefore might be continued indefinitely until the guilty party was tried and punished therefor by the slow process of criminal procedure. If this were so, personal liberty would be better protected by at once repealing all laws which provide such criminal punishment;

leaving the courts to enforce obedience to the writ of *habeas corpus* by the process of attachment, which in most cases is ample for the purpose. In the course of my examinations I have not chanced to meet with this objection in any prior case; and I presume it is raised now for the first time. This is somewhat remarkable, if the objection is well taken. The English statutes contain similar provisions ·to our own for the punishment of those who evade the writ (*Act* 31, *Car. II.* § 5; *see statute in full, Appen-.* *dix to Hurd on Hab. Corp. p.* 657, *and Appendix to Lieber,* *Civil Liberty, etc.,*) and also highly penal provisions for confining persons in prisons beyond the seas (*ibid.* § 12); and it is scarcely possible, if the objection now taken has force, that it should not have been raised before. It would certainly be as applicable to the case of a person removed beyond the limits of the state for confinement as to that of a child eloigned from his guardian; but I can not conceive of any sound reason for it in either case.

If this were an attempt to compel a respondent to answer to facts set forth in a petition which amounted to a criminal offense by him, and he should claim exemption from answer on the ground that it might tend to criminate him, considerations would be presented different from any now ·before us. Neither at the outset nor since has the respondent claimed his privilege; and he has now answered, as he claims, fully to all the facts. The sole question, then, on this branch of the case, is, whether the fact that respondent may be liable criminally for what he has done precludes our compelling the delivery of the child to his guardians on this writ. Clearly it does not. This writ is given as a speedy and effectual remedy in the cases to which it is applicable; and its object is, not the punishment of the respondent, but to relieve the petitioner from unlawful custody. Usually it does not go further. Whatever may be the rights or liabilities of the parties beyond those which relate to the custody, they are left untouched

by the decision on this writ, and may be enforced by the ordinary remedies. It is no objection to civil prosecutions that criminal proceedings are in progress for the same act — 1 *Bish. Cr. L.* § 327, *et seq.* — much less that the party in whose person the state is wronged is seeking to recover his liberty that he may be in position to assert and defend his rights.

The second proposition — that the statutory provisions are confined to the case of imprisonment within the state — seems to me to be based upon a misconception as to the source of our jurisdiction. It was 'never the case in England that the Court of King's Bench derived its jurisdiction to issue and enforce this writ from the statute. Statutes were not passed to give the right, but to compel the observance of rights which existed. The writ is so ancient that its origin is lost in obscurity, and the *Habeas Corpus Act of* 31, *Car. II.*, introduced no new principle. *Hallam Const. Hist. ch.* 13; *Beeching's case,* 4 *B. & C.* 136; 2 *Kent,* 26 — *marg.* Indeed that statute was aimed mainly at judicial and ministerial officers — 1 *Chit. Cr. L.* 131; *Kirk's case,* 5 *Mod.* 454 — and it provided heavy penalties for failure to observe and perform those duties which the common law, as declared in Magna Charta, enjoined upon them. The act itself was much less broad than the remedy had been before; being confined in its scope to imprisonment for criminal or supposed criminal matters — *Case of Lord Mayor of London,* 3 *Wils.* 198; *Wilson's case,* 7 *Q. B.* 984 — and the contest in Parliament nearly a century later, over the attempt to extend its provisions to other cases, was defeated by the memorable opposition of Lord Mansfield, expressly on the ground that it was unnecessary, and that the remedy at the common law was ample. — *Hurd on Hab. Corp.* 102; *Life of Mansfield by Lord Campbell,* 2 *Lives of Chief Justices, chap.* 35; 15 *Hansard's Debates,* 897 *et seq.*

The opposition was disingenuous, and did not satisfy the majority of the House of Commons; but it was effectual for the time, and the attempt was not successfully renewed until 1816. But the answers given by the judges to the questions put to them by the parliament of 1758, and which are fully reported by *Hansard*, show very clearly that the difficulty sought to be remedied was not the want of power, but the disposition to procrastinate and evade the performance of duty. Lord Mansfield himself in the case of *Rex v. Cowle, Burr.* 856, decided in the next year after this great debate, and involving the right to issue the writ to Berwick-upon-Tweed, declared that the Court of King's Bench, as representing the Crown, had power to issue the writ, not only to any place within the kingdom of England, but to Ireland, the Isle of Man, the Plantations, and to every other dominion of the crown of England. And, as he said in that case, the question of issuing the writ, where the place was under the subjection of the crown of England, was not one of power, but of propriety. In *Siderfin*, a case is noted where the writ issued to the Governor of Jersey — *Roy v. Overton, p.* 386; and a recent case, (*Wilson's case,* 7 *Q. B.* 984, decided in 1845,) to the same island, was very fully considered, though the court would not even take judicial notice of the law which must govern.

The English statute authorized proceedings by warrant to take the body of a party in danger of being removed from the realm; and a like process is authorized by our law. It is of utmost importance, because, where the party restrained of his liberty is removed, the restraining power, except as that may rest in the executive in some cases, is almost invariably removed also. And there was abundant reason for the penal provisions in the English statute against imprisonments beyond the seas, without seeking it in the absence of this specific remedy at home. Those imprisonments were in derogation of common law right, and opposed to the traditional instincts of the English

mind. Declaring them illegal under all circumstances, relieved not only the home courts, but the courts elsewhere of any question that might possibly have been raised on that point. Moreover, such imprisonments would generally be directed by the executive; and — not to speak of any disputed question before — from the time of the accession of the Stuarts, there were always countries over which the King of England was sovereign which did not pertain to the crown of England, and where, although the King had authority, the writs from the King's English courts did not run. Not only, therefore, might those questions of expediency arise to which Lord Mansfield alluded in *Rex v. Cowle, Burr.* 856, when the imprisonment was abroad, though within reach of prerogative writs, but there might be other cases which no English writ could reach ; and a prudent jealousy of a race of kings of foreign descent and ruling over several realms, would sufficiently account for these provisions. They by no means exclude the idea of other remedy within the realm by resort to this writ in cases where it can be made effectual.

I have spoken of the remedy in the King's Bench, because it is to that our jurisdiction must be likened. It would appear that the jurisdiction of chancery within the realm was also general before the *Habeas Corpus* Act — 2 *Inst.* 55, *a ;* 4 *Inst.* 290 — and though it was formerly held that the Common Pleas and Court of Exchequer had jurisdiction only for privileged persons, the contrary was decided in the important case of *Bushell,* who was imprisoned for his verdict acquitting Penn — *Vaughn's Rep.* 135 — and this case was followed in *Wood's case,* 3 *Wils.* 172. When the constitution gave this court jurisdiction of the writ, I think it conferred the same full powers upon the court, as representing the sovereignty of the people, which the court of King's Bench possessed as representing the Crown of England. Our jurisdiction does not depend upon

the statute, and the main purpose of that, here as in England, is to compel the performance of judicial and ministerial duties. Chancellor Kent says — 2 *Kent*, 27 — "The right of deliverance from all unlawful imprisonment, to the full extent of the remedy provided by the *Habeas Corpus* Act (*of* 31, *Ch. II.*), is of common law right." And by this he means, as the context shows, without regard to the cause of imprisonment, so that it be unlawful. The statute does not give the writ, but renders it more effectively and actively remedial. I therefore attach no special importance to the particular wording of the statute where it speaks of the cases in which the writ is to be issued; though I should not concede that, within the words employed, the actual presence of the body of the petitioner within the state was a controlling circumstance. If the statute lacks comprehensiveness, it may be that the same opportunities are afforded for evasions of duty by courts that existed in England before the statute 31, Charles II. but until a disposition to evade duty shall be manifest, it will not be important. The common law jurisdiction is ample. As it came from no statute, it is not confined in its scope to any prescribed limits, but is co-extensive with the cases to which its principles can be applied, and in which it can afford a remedy. I am aware of nothing which limits the power of the court upon this writ, but its capacity to give relief in the particular case in accordance with the settled rules which govern this mode of proceeding. I know of no other test that can have determined its jurisdiction at the common law; and while the law holds the right to personal liberty in the same high regard as now, the same test will probably continue to be applied.

The important fact to be observed in regard to the mode of procedure upon this writ is, that it is directed to, and served upon, not the person confined, but his jailer. It does not reach the former except through the latter.

In the Matter of Samuel W. Jackson.

The officer or person who serves it does not unbar the prison doors, and set the prisoner free, but the court relieves him by compelling the oppressor to release his constraint. The whole force of the writ is spent upon the respondent; and if he fails to obey it, the means to be resorted to for the purposes of compulsion are fine and imprisonment. This is the ordinary mode of affording relief; and if any other means are resorted to, they are only auxiliary to those which are usual. The place of confinement is therefore not important to the relief, if the guilty party is within reach of process, so that by the power of the court he can be compelled to release his grasp. The difficulty of affording redress is not increased by the confinement being beyond the limits of the state, except as greater distance may affect it. The important question is, where is the power of control exercised? And I am aware of no other remedy. The writ *de homine replegiando* was repealed in this state in 1838. — *R. S.* 1838, *p.* 521. Long before that, it had fallen into disuse, and the cases are very rare in which it was ever resorted to in this country. Hurd (on *Hab. Corp.* 144), gives as a reason for this, that, though used to attain a similar object with the present writ, it was more limited in its application, and more complicated and slow in its operation. As it has never been the object of our legislation to diminish the safegards of personal liberty, we must presume the legislature repealed this, among other obsolete writs, in the full belief that the writ of *habeas corpus* gave ample remedy in the cases where resort to personal replevin might before have been had. That, certainly, was the view of Chancellor Kent when he spoke of the present writ as the " easy, prompt, and efficient remedy afforded *for all unlawful imprisonment.*"— 2 *Kent's Com.* 32.

What I say on this subject is carefully restricted to the case of a citizen of our own state unlawfully held in custody elsewhere by another person, who is himself within

the jurisdiction of this court. If he is here, the wrong is being done here; for the wrong is done wherever the power of control is exercised. There is no inherent difficulty in the case; and the court of chancery, in the exercise of its power to compel specific performance, frequently exerts an authority over a subject matter in a foreign jurisdiction similar to that which is sought for here. I think the case presented by the petition is one in which we can give relief, and the decision in *United States v. Davis*, 5 *Cranch. C. C.* 622, is in point, and will warrant it. There are no conflicting decisions. The incidental remarks which have been made in some cases about the remedy applying where the imprisonment is within the state, seem to me of no significance. In none of those cases was attention directed to this particular point; and I have already indicated my opinion that imprisonment, within the meaning of the law, may be held to be wherever the person is who imprisons. This writ is based upon no technical reasons, but its scope is as broad as its power to give redress.

It remains to be seen how the case is affected by the subsequent pleadings.

The motion to dismiss, when renewed, was in the nature of a demurrer to the traverse of respondent's answer. The answer denied, with considerable particularity, the principal facts set out in the petition; averred the child to be in Canada, in the custody of respondent's wife, who refused to submit to respondent's control, and declared her purpose of remaining abroad, with a view to retaining the child's custody. The answer also averred that on application to a court of competent jurisdiction in Canada, the wife had been appointed the child's guardian, and now held and controlled it under that appointment; and that the child was in no degree under the power, custody or control of the respondent. This last averment of the answer, as well as the respondent's denial

15 Mich. — 2d.

that the child was originally removed from the State by his means, are put in issue by the answer.

I am constrained to say that, in my opinion, the traverse does not cover the ground of the answer. It is not denied that the wife has procured herself to be appointed guardian of the child abroad, and that she now assumes to hold it under that appointment. This fact is an element in the case which cannot be overlooked, and which quite distinguishes it from the simple case of a detention by a person here by means of an agent abroad. Leaving out of view all those delicate questions which might arise as to compelling the delivery up of the child by the wife against her will, through the coercion of the husband, and coming directly to the point which alone we must consider now, whether the coercion can be applied when it already appears that the wife is acting as guardian under an appointment which we must assume to be good in form, and recognized there as valid, I am unable to see upon what ground we could base our justification in issuing compulsory process against the husband.

The fact that he originally connived at and assisted in removing the child, is not important now, unless it is still within his control. This is not the proper proceeding in which to punish him for that act, except by way of compelling him to deliver the child to the proper custody, if he now has the power to do so. If the child is held in a foreign jurisdiction by one appointed his guardian there, the respondent has legally no such power as is claimed, even though the person having the custody may have been his agent, and, as such, procured the appointment. The agency does not enter into the guardianship. The law there will know nothing of such an agency, and will refuse to recognize it. The custody has ceased to be that of the individual, and has become that of the agent of the law. That law is the foreign law; and we must come directly in conflict with it, if we exercise jurisdiction on

the facts here shown. The case, as it would stand in Canada, would be that of a guardian appointed by its courts over a minor within its jurisdiction, coerced indirectly by a foreign court to remove the child abroad, and there deliver it to custodians whose authority would not be recognized in Canada while the present appointment stands. It would be an indirect assumption of jurisdiction by the court in Michigan over the appointment made in Canada, even to the extent of reversing that action. I know of no precedent for such a course, and a due regard to inter-state comity should incline us to forbear.

It is quite probable that the appointment in Canada was made in ignorance of the real facts of the case. I can not doubt if these were fully presented, the court there would revoke its action, and cause the child to be delivered to the testamentary guardians. In my opinion, that court is the tribunal to appeal to under the facts disclosed by the pleadings.

CHRISTIANCY J. concurred.

The Justices all concurring that the proceedings should be dismissed, it was ordered accordingly.

NOTE.—On page 427, 6th line from the bottom, after the word "writ," insert the word *but.*