UNITED STATES v. AH FAWN.

(District Court, S. D. California. September 18, 1893.)

No. 487.

CHINESE—DEPORTATION—WHO ARE LABORERS—TREATY OF 1880—CONSTRUCTION.
The words "Chinese laborers," as used in section 6 of the Geary act, (27 Stat. 25.) have the same meaning as in the treaty with China of 1880, (22 Stat. 826,) in which they are broad enough in their true meaning and intent to include Chinese gamblers and highbinders, since section 2 of the treaty by exclusion provides that no Chinese should be entitled to the benefit of the general provisions of the Burlingame treaty (16 Stat. 739) but those who come to the United States for purposes of teaching, study, mercantile transactions, travel, or curiosity.

At Law.    Proceedings by the United States for the deportation of Ah Fawn for violation of section 6 of the Geary act.    Order for deportation granted.

George J. Denis, U. S. Atty.
A. B. Hotchkiss and F. J. Thomas, for defendant.

ROSS, District Judge.    The complaint in this case charges the defendant with a violation of the sixth section of the act of congress of May 5, 1892, commonly called the "Geary Act."    It alleges that the defendant was at the time of the passage of the act a Chinese laborer within the limits of the United States, and en-

titled to remain therein, and that he failed to procure the certificate of residence required by its sixth section of all such resident Chinese laborers, and that he was found after one year from its passage without such certificate within the jurisdiction of the United States, and within this judicial district.    The evidence in the case clearly shows that the defendant is, and has been for several years last past, a gambler, engaged in conducting games of chance in this city.    In other cases submitted with the present one the evidence shows that the defendants, in addition to being gamblers, belong to the criminal class commonly called "highbinders."    The sixth section of the act in question applies alone to "Chinese laborers within the limits of the United States at the time of the passage of this act, and who are entitled to remain in the United States."

The question to be determined is, what is the true construction of the words "Chinese laborers," as here used by congress?    Etymologically, a laborer is one who labors.    In that broad sense, a practicing physician is a laborer, and a hard one, too.    So, also, is the practicing lawyer.    In that sense the professional journalist is a laborer; as is, also, every minister of the gospel.    In the same sense every merchant is a laborer.    But in neither speech nor writing is such the common or ordinary acceptation of the term "laborer."    Worcester thus defines it: "One who labors; one regularly employed at some hard work; a workman; an operative; often used of one who gets a livelihood at coarse, manual labor, as distinguished from an artisan or professional man."    And the definition given by Webster is to the same effect.    Neither of these considerations furnishes, in my opinion, a true solution of the question.    Undoubtedly a gambler is not a "laborer," in the ordinary and popular meaning of that term; nor is a "highbinder," whose avocation is understood to be the commission of any and every species of crime.    In the act in question congress did not define the terms "Chinese laborers" employed by it.    To ascertain the true meaning of the words so used the purpose of the act must be considered.    As its sixth section, providing, as it does, for the expulsion from this country of all Chinese laborers within it at the time of the passage of the act who should fail to comply with its provisions, whether they came here at the invitation of our government or otherwise, in its stringency went far beyond the provisions of the existing treaties between the two countries, it would be altogether unreasonable to hold that the words "Chinese laborers" in that very section of the act were used in any narrower sense than were the same words in the treaty under which congress was legislating.    It is pertinent and important, therefore, to inquire what is the scope of those words in that treaty.

Under the treaty of 1868, known as the "Burlingame Treaty," as construed in practice, the Chinese had the absolute right to come in any numbers to the United States.    The trouble caused by the great influx of them induced the United States government to ask, through a commission composed of Messrs. James B. An-

gell, John F. Swift, and William Henry Trescot, that the Chinese government consent to such a modification of the Burlingame treaty as would enable it, without raising unpleasant questions of treaty construction, to regulate, limit, suspend, or prohibit Chinese immigration. Commissioners on the part of China were also appointed, and after the necessary preliminary negotiations the United States commissioners made to the Chinese commissioners the following proposition:

"To indicate more precisely the wishes of the United States, we suggest the following proposition for the consideration of the Chinese government:

"Article 1. The United States of America and the emperor of China recognize the mutual benefit which results from the proper intercourse of the citizens and subjects of all nations, and, in order to encourage such intercourse between the two countries, agree that citizens of the United States visiting or residing in China and subjects of China visiting or residing in the United States for the purpose of trade, travel, or temporary residence for the prosecution of teaching, study, or curiosity shall enjoy in the respective countries all the rights, privileges, immunities, and exemptions which are granted by either country to the citizens and subjects of the most favored nations.

"Art. 2. Whenever, in the opinion of the government of the United States, the coming of Chinese laborers to the United States, or their residence therein, affects, or threatens to affect, the interest of that country, or to endanger the good order of the said country, or of any locality within the territory thereof, the government of the United States may regulate, limit, suspend, or prohibit such coming or residence, after giving timely notice of such regulation, limitation, suspension, or prohibition to the government of China; and the words 'Chinese laborers' are herein used to signify all immigration other than that for teaching, trade, travel, study, and curiosity hereinbefore referred to and authorized and provided for in existing treaties.

"Art. 3. But it is distinctly understood between the contracting parties that all Chinese subjects who, under the faith of existing treaties, have gone into or are now residing in the United States, shall be guarantied all the protection, rights, immunities, and exemptions to which they are now entitled under the provision of said treaties." Foreign Relations of the United States, 1881, p. 177.

On the 22d of October, 1880, the Chinese commissioners submitted to the commissioners of the United States a memorandum in reply, which, so far as it refers to article 2 of the proposition of the United States commissioners, is as follows:

"Section 2 declares that there are difficulties growing out of the immigration of Chinese laborers to the United States, and explains that the words 'Chinese laborers' are used to include all persons except such as go thither for the purpose of teaching, study, trade, travel, and curiosity. The separation of this class from the mass of the subjects of China in this manner is not in strict accord with the spirit of our treaties, and in practical operation would meet with many difficulties. But, bearing in mind the deep friendship between the two governments, in the event of embarrassments on either part, a solution must be sought in a spirit of mutual concession." Id. p. 178.

At a conference of the commissioners of the two countries, held October 23, 1880, the Chinese commissioners submitted to the United States commissioners the project of a treaty, article 2 of which was in these words:

"Chinese who may be desirous of proceeding to any other part of the United States for purposes of labor, excepting only the state of California, shall be allowed to go of their own free will and accord. Persons of all other classes, with the exception of actual Chinese laborers, whose immigration into California will be temporarily regulated and limited by the United

States, whether proceeding to California as teachers, students, travelers, traders, or artisans, as well as all Chinese laborers now in that state, will be allowed to go and come with entire freedom, and will not be included in the limiting regulations." Id. p. 186.

In reporting that conference to the secretary of state, Mr. Evarts, the United States commissioners, under date November 3, 1880, said, among other things, that, the proposition being in Chinese, "we could only gather its general purport from a rapid translation by Mr. Holcombe. Mr. Trescot, on behalf of the commissioners, informed the Chinese commissioners that we would take it into consideration, but that we could and ought to say at once that there were some points which were inadmissible, and could not be received by us even for consideration. The first was the limitation of the provisions of the treaty to Chinese immigration into California. To this the Chinese commissioners replied that such was not their intention, but, as they had been led to suppose from all they heard that objection to such immigration existed chiefly, if not only, in California, they had suggested this form, in order that its discussion might lead to a better understanding. * * * Another point was the exclusion of 'artisans' from the class of Chinese labor whose immigration was forbidden by the proposed provisions. In reference to this Mr. Trescot stated that it was an inadmissible limitation upon that definition of Chinese labor which had been suggested by the United States commissioners. It was deemed best by the United States commissioners," continues the report, "not to do more at this interview than signify their great disappointment at the scope and tenor of the Chinese project, and to reserve a full review of its provisions until it had been translated." Id. p. 182. Subsequently, the United States commissioners submitted to the Chinese commissioners a counter project, articles 1 and 2 of which are as follows:

"Article 1. Whenever, in the opinion of the government of the United States, the coming of Chinese laborers to the United States, or their residence therein, affects, or threatens to affect, the interest of that country, or to endanger the good order of the said country, or of any locality within the territory thereof, the government of the United States may regulate, limit, or suspend such coming or residence; and the words 'Chinese laborers' are herein used to signify all immigration other than that for teaching, trade, travel, study, and curiosity.

"Art. 2. Chinese subjects, whether proceeding to the United States for purposes of teaching, study, travel, curiosity, or trade, with their body servants, shall be allowed to go and come with entire freedom." Id. p. 187.

The United States commissioners accompanied this last proposition with a memorandum, in which they said, among other things:

"The United States commissioners feel it their duty to insist upon their definition of 'Chinese laborers,' viz.: 'The words "Chinese laborers" are herein used to signify all immigration other than that for teaching, trade, travel, study, and curiosity, hereinbefore referred to, and provided for in existing treaties.' They cannot consent that artisans shall be excluded from the class of Chinese laborers, for it is this very competition of skilled labor in the cities where the Chinese labor immigration concentrates which has caused the embarrassment and popular discontent they wish to avoid. But

they are willing to adopt an article providing that the classes who are authorized to come to and reside in the United States shall bring the servants who are necessary to their convenience." Id. p. 188.

The respective commissioners subsequently agreed upon a treaty, which was afterwards signed and ratified by the respective governments, the articles of which relating to the question under consideration being as follows:

"Article 1. Whenever, in the opinion of the government of the United States, the coming of Chinese laborers to the United States, or their residence therein, affects, or threatens to affect, the interests of that country, or to endanger the good order of the said country, or of any locality within the territory thereof, the government of China agrees that the government of the United States may regulate, limit, or suspend, such coming or residence, but may not absolutely prohibit it. The limitation or suspension shall be reasonable, and shall apply only to Chinese who may go to the United States as laborers; other classes not being included in the limitations. Legislation taken in regard to Chinese laborers will be of such a character only as is necessary to enforce the regulation, limitation, or suspension of immigration, and immigrants shall not be subject to personal maltreatment or abuse.

"Art. 2. Chinese subjects, whether proceeding to the United States as teachers, students, merchants, or from curiosity, together with their body and household servants, and Chinese laborers who are now in the United States, shall be allowed to go and come of their own free will and accord, and shall be accorded all the rights, privileges, immunities, and exemptions which are accorded to the citizens and subjects of the most favored nation." Treaties and Conventions, 1776–1887, p. 182.

The United States commissioners, in communicating, under date November 6, 1880, to the secretary of state, Mr. Evarts, their agreement with the Chinese commissioners upon the articles of the treaty, said, among other things:

"We desired, as you will see by the precis of the negotiation, to define with more precision exactly what all the negotiators on both sides understood by 'Chinese laborers;' but the Chinese government was very unwilling to be more precise than the absolute necessity called for, and they claimed that in article 2 they did by exclusion provide that nobody should be entitled to claim the benefit of the general provisions of the Burlingame treaty but those who went to the United States for purposes of teaching, study, mercantile transactions, travel, or curiosity. We have no doubt that an act of congress excluding all but these classes, using the words of the treaty, would be fully warranted by its provisions, and as this was a clear and sufficient modification of the sixth article of the Burlingame treaty, we did not feel authorized to risk such a concession by insisting upon language which would really mean no more, and which was entirely unacceptable to the Chinese commissioners. There is not in the treaty any language which modifies this concession, and there was not, as we think, the slightest intention on the part of the Chinese commissioners to diminish the full force of the discretion given to the United States." Id. p. 189.

As finally drafted and agreed upon, the words "Chinese laborers" were not defined; and so their true meaning in the treaty, as in the statute, is a matter for construction.

The history of the negotiations, as already detailed, leading up to the making of the treaty, clearly shows that throughout them the United States commissioners insisted that the words "Chinese laborers" should include all immigration other than that for teaching, trade, travel, study, and curiosity. The first proposal on the

part of the United States commissioners so to define them in the treaty itself met on the part of the Chinese commissioners, not a refusal, but with this response:

"The separation of this class from the mass of the subjects of China in this manner is not in strict accord with the spirit of our treaties, and in practical operation would meet with many difficulties. But, bearing in mind the deep friendship between the two nations, in the event of embarrassments on either part, a solution must be sought in a spirit of mutual concession."

This was followed by a proposal on the part of the Chinese commissioners of articles in which the word "actual" was inserted immediately before the words "Chinese laborers," and inserting the word "artisans" among the privileged classes. These suggestions met with distinct refusals on the part of the United States commissioners, and both of those words were omitted from the treaty as finally agreed upon, signed, and ratified. Their insertion would have given the words "Chinese laborers" the ordinary and popular meaning of laborers as defined by the lexicographers, to wit, those engaged in hard, manual work. Their omission, under the circumstances stated, clearly shows that it was intended that they should have a broader meaning. Moreover, had the intention been to confine the words "Chinese laborers" to those engaged in hard, manual work, the inhibition would have applied to none other, and there would have been no occasion to make a specific provision, as was done by article 2, for the coming to this country of teachers, students, merchants, or those for curiosity, together with their body and household servants. There was, therefore, good ground for the claim, reported by the United States commissioners to have been made by the Chinese commissioners, to the effect that article 2 of the treaty as agreed upon "did by exclusion provide that nobody should be entitled to claim the benefit of the general provisions of the Burlingame treaty but those who went to the United States for purposes of teaching, study, mercantile transactions, travel, or curiosity." And that such was also the understanding of the United States commissioners is distinctly declared in their report to the secretary of state, already quoted. Read, therefore, in the light of the accompanying proceedings, it is clear that the words "Chinese laborers" employed in the treaty of 1880 are not limited to those who do hard, manual work, but that they are broad enough in their true meaning and intent to include Chinese gamblers and "highbinders;" and, for the reasons already given, it is manifest that congress, in passing the act of May 5, 1892, did not use the words "Chinese laborers" in any narrower sense than were the same words in the treaty under which it was legislating.

It results that there must be findings for the government, and an order that the defendant be deported.