### Ex parte NG QUONG MING.

#### (District Court, S. D. New York. February 9, 1905.)

CHINESE EXCLUSION—SCOPE OF TREATIES AND LEGISLATION—CHINESE PERSON OTHER THAN LABORER PREVIOUSLY DOMICILED IN UNITED STATES.

Neither the Chinese treaty of 1880, nor subsequent legislation relating to Chinese exclusion, has any relation to Chinese persons, not of the laboring class, who were at the time of the adoption of that treaty domiciled in the United States, and who have since continued to reside therein; and such a person who temporarily leaves the country, with the intention of returning, cannot be excluded on his return because he is not included in one of the classes expressly excepted from the operation of the exclusion acts, and who alone are permitted to enter the United States by rules 1 and 2 of the regulations adopted by the Department of Commerce and Labor; such rules being applicable only to persons seeking to enter for the first time.

[Ed. Note.—For cases in point, see vol. 2, Cent. Dig. Aliens, § 85.

Citizenship of the Chinese, see note to Gee Fook Sing v. United States, 1 C. C. A. 212; Lee Sing Far v. United States, 35 C. C. A. 332.]

Max J. Kohler, for petitioner.
William Michael Byrne, Asst. U. S. Atty.

HOLT, District Judge. These are writs of habeas corpus and certiorari to test the legality of the detention at Malone, N. Y., of the petitioner, a Chinaman applying to return to this country. The petitioner came to this country 46 years ago, and has had a domicile of residence at San Francisco ever since. He is a grand master of the lodge of Freemasons for California, and has been for some time deputized by that organization to travel throughout the United States and Canada, organizing societies of his countrymen in the Masonic order. In May, 1894, the petitioner obtained a certificate of residence from the collector of internal revenue for the First District of California. The certificate stated upon its face that it was issued to a person other than a laborer, giving his occupation as a "Chinese Masonic organizer." Some months ago he went to Canada to organize Masonic lodges among the Chinese there; and, on attempting to return to this country, was detained at Malone, and refused admission by the Chinese exclusion inspector, whose decision was affirmed on appeal by the Secretary of Commerce and Labor. The inspector states in his opinion that "it is probable  *  *  *  that this person is what he claims to be. However, he is not a merchant, a teacher, a student, or a traveler for curiosity and pleasure"—and that therefore he comes under the provisions in rule 2 of the regulations promulgated by the Secretary of Commerce and Labor in regard to Chinese immigration, which provide that "only those Chinese persons who are expressly declared by the laws and treaty regulating the exclusion of Chinese to be admissible shall be

allowed to enter the United States." This decision was affirmed by the Secretary of Commerce and Labor on the same ground, namely, that rule 2 governed the case.

When this matter was first submitted, the petitioner was not produced in court, and no proof was furnished that there had been any agreement between counsel waiving his production. The writs were therefore dismissed on the ground that the courts in the Northern District, and not this court, had jurisdiction. A motion for a reargument was made, and it was shown upon such motion that there had been an agreement between counsel which practically admitted that the respondent had the petitioner in his custody and control, and which agreed to waive his production in this court. In my opinion, such a stipulation conferred jurisdiction of the case upon this court in the same manner as though the petitioner had been produced in court, as was recently held in the Case of Fong Yim, 134 Fed. 938. As this petitioner had been domiciled in this country for a great many years, and had a domicile of residence here before any Chinese exclusion laws were adopted, I think that the decision of the inspection officers is not final, and that he had a right to test the legality of the decision upon habeas corpus, on the grounds stated in my opinion in the Case of Fong Yim.

The question on the merits in this case is whether rules 1 and 2 of the Chinese regulations prescribed by the Secretary of Commerce and Labor are valid as to a Chinaman domiciled in this country, not of the laboring class, who, having left the country temporarily, without any intention of abandoning his domicile, desires to return, and who is not included in one of the classes of persons declared to be entitled to enter under rule 1.

The sixth article of the treaty of 1868 provides that:

"Chinese subjects visiting or residing in the United States shall enjoy the same privileges, immunities, and exemptions, in respect to travel or residence, as may there be enjoyed by the citizens or subjects of the most favored nations."

When this treaty was ratified the petitioner had lived in this country about 10 years, and then had a domicile of residence at San Francisco. The treaty of 1868 is still in full force, except as it may have been modified by subsequent treaties or acts of Congress.

The Chinese treaty of 1880 states, in its preamble, that:

"The government of the United States, because of the constantly increasing immigration of Chinese laborers to the territory of the United States, and the embarrassments consequent upon such immigration, desires to negotiate a modification of the existing treaties."

The first article provides that:

"Whenever, in the opinion of the government of the United States, the coming of Chinese laborers to the United States, or their residence therein, affects or threatens to affect the interests of that country, * * * the government of China agrees that the government of the United States may regulate, limit, or suspend such coming or residence."

The second article provides that:

"Chinese subjects, whether proceeding to the United States as teachers, students, merchants, or from curiosity, together with their body and household servants, and Chinese laborers who are now in the United States shall be allowed to go and come of their own free will and accord, and shall be ac-

corded all the rights, privileges, immunities, and exceptions which are accorded to the citizens and subjects of the most favored nations."

It will be observed that the whole object of this treaty was substantially to exclude Chinese laborers; that it expressly permitted Chinese subjects who were teachers, students, merchants, or traveling for curiosity, to go and come of their own free will; and that no reference is expressly made to those Chinese persons, not of the laboring class, who were at the time of the adoption of the treaty, domiciled in the United States. This treaty, it seems to me, has sole reference to persons thereafter coming into the United States. The history of the negotiations between the commissioners of the two countries which resulted in the adoption of this treaty, a full account of which is given in the case of United States v. Ah Fawn (D. C.) 57 Fed. 591, establishes, in my opinion, that under its provisions Congress had the right to exclude all Chinese subjects thereafter coming to this country, except the classes mentioned in the treaty; that is to say, teachers, students, merchants, or persons traveling for curiosity, together with their body and household servants. The first exclusion act, passed in 1882 (Act May 6, 1882, c. 126, 22 Stat. 58 [U. S. Comp. St. 1901, p. 1305]), after the adoption of the treaty of 1880, provided that thereafter it should not be lawful for any Chinese laborer to come into the United States, but contained no provision in reference to what Chinese subjects, other than laborers, might come in, except the thirteenth section (22 Stat. 61 [U. S. Comp. St. 1901, p. 1311]), providing that the act should not apply to diplomatic and other officers of the Chinese government traveling upon the business of that government; but the amendatory act of 1884 (Act July 5, 1884, c. 220, 23 Stat. 116 [U. S. Comp. St. 1901, p. 1307]) provides, in section 6, that "every Chinese person, other than a laborer, who may be entitled by the said treaty or this act to come within the United States, and who shall be about to come to the United States, shall obtain the permission of and be identified as so entitled by the Chinese government," to be evidenced by a certificate to be issued by the government, stating various particulars. The Supreme Court held in the case of Lau Ow Bew, 144 U. S. 47, 12 Sup. Ct. 517, 36 L. Ed. 340, that this section did not apply to Chinese merchants already domiciled in the United States, who, having left the country for temporary purposes, animo revertendi, seek to re-enter it on their return to their business and their homes, and that they have a legal right to enter without any certificate.

The act of September 13, 1888, c. 1015, 25 Stat. 476 [U. S. Comp. St. 1901, p. 1312], entitled "An act to prohibit the coming of Chinese laborers to the United States," provides, in the first section, that:

"From and after the date of the exchange of ratifications of the pending treaty between the United States of America and the Emperor of China, signed March 12, 1888, it shall be unlawful for any Chinese person, whether a subject of China or of any other power, to enter the United States, except as hereinafter provided."

The second section provides that "Chinese officials, teachers, students, merchants, or travelers for pleasure or curiosity, shall be permitted to enter the United States" under certain conditions. These sections of the act of 1888, if they had ever taken effect, would, I think, have au-

thorized the exclusion of all Chinese persons coming to this country, after the passage of the act, who were not included in the categories in the second section. But the treaty of 1888 was never ratified (Li Sing v. United States, 180 U. S. 486, 21 Sup. Ct. 449, 45 L. Ed. 634), and therefore those provisions of the act of September 13, 1888, which were to take effect after the ratification of the treaty never went into effect. There was considerable discussion whether any part of the act ever went into effect; some holding that the entire act was dependent upon the ratification of the treaty, and others that certain sections— from 5 to 14, inclusive—were independent legislation, which went at once into effect irrespective of the ratification of the treaty. Apparently to settle doubts on this question, by the act of April 29, 1902, c. 641, 32 Stat. 176, sections 5 to 14 of the act, with the exception of section 12, were re-enacted; but I am not aware that any one has ever claimed that sections 1 and 2 of that act [U. S. Comp. St. Supp. 1903, p. 189] ever became operative, and I think that it is clear that they never did.

The act of 1892 provided that all Chinese laborers within the United States should apply for a certificate of residence, and the sixth section provided that:

"Any Chinese person, other than a Chinese laborer, having a right to be and remain in the United States, desiring such certificate as evidence of such right, may apply for and receive the same without charge."

This provision obviously does not compel any person other than a Chinese laborer, having a right to remain in the United States, to take out such a certificate. The only object of taking out such a certificate by a Chinese nonlaborer domiciled in this country is for him to have a convenient means of proof of his right to remain here. This act of 1892 was the one under which the petitioner took out his certificate, which stated upon its face that he was a person other than a laborer, and which described him as a "Chinese Masonic organizer."

No other act of Congress has been called to my attention which enumerates any class of persons, other than laborers, who shall be permitted to enter the United States. The Chinese treaty of 1894, however, which recites that "the government of China, in view of the antagonism and much deprecated and serious disorders to which the presence of Chinese laborers has given rise in certain parts of the United States, desires to prohibit the emigration of such laborers from China to the United States," provides, in the first section, that "for a period of ten years, * * * the coming, except under the conditions hereinafter specified, of Chinese laborers to the United States shall be absolutely prohibited." The third section provides that "the provisions of this convention shall not affect the right at present enjoyed by Chinese subjects, being officials, teachers, students, merchants, or travelers for curiosity or pleasure, but not laborers, of coming to the United States and residing therein." This treaty of 1894, however, has recently been abrogated.

In 1903, the Secretary of Commerce and Labor promulgated certain Chinese regulations. Rule 1 provides that:

"Under the provisions of the laws and treaties in relation to the exclusion of Chinese persons, only such persons as are registered Chinese laborers, offi-

cials of the Chinese government, teachers, students, travelers for curiosity or pleasure, merchants and their lawful wives and minor children, laborers seeking in good faith to pass through the country to foreign territory, seamen as provided in rules 15 and 16, and persons whose physical condition necessitates immediate hospital treatment shall be permitted to land at any port of the United States."

Rule 2 provides that:

"Only those Chinese persons who are expressly declared by the laws and treaty relating to the exclusion of Chinese to be admissible shall be allowed to enter the United States, and those only upon compliance with the requirements of said laws and treaty and of regulations issued thereunder. See Op. Atty. Genl., vol. xxii, p. 132."

The opinion of the Attorney General referred to in this rule was given in respect to an application of certain Chinese persons who sought admission to the United States for the first time. In the course of that opinion, the Attorney General says that in respect to Chinese legislation—

"It may be stated comprehensively that the result of the whole body of these laws, and decisions thereon, is to determine that the true theory is not that all Chinese persons may enter this country who are not forbidden, but that only those are entitled to enter who are expressly allowed."

It is not necessary to determine in this case whether no Chinese persons except those affirmatively designated as being entitled to enter by the existing treaties, and who are comprehensively enumerated in rule 1, have a right to enter. The question in this case is whether a Chinese person who has had a domicile of residence in this country from a period before any treaties or laws relating to the exclusion of Chinese existed, and who has temporarily left the country, without any intention of abandoning his domicile, and with the intention of returning, can be excluded from returning because he is not included in one of the classes designated in rule 1. The petitioner in this case is not a laborer, or an official, a teacher, a student, a traveler, or a merchant. He is described in the certificate as a "Chinese Masonic organizer." The proof shows that he is a man of high standing in that order, and is employed by that organization in promoting its interests. I am not a Mason, but I believe that that great and ancient order is one whose objects are praiseworthy, and whose influence is beneficent; and I think that it may be assumed that a man who occupies a high position in it, and who is employed by it to work in its interests, is a man of character, capacity, and intelligence. I can see no reason to doubt that he had, under the treaties between this country and China, which were concluded after he had adopted this country as his place of residence, a right to continue his residence in this country, and the certificate issued to him in 1894 officially admits it. I can see nothing in the treaties or the laws in relation to Chinese exclusion, which were avowedly passed to prevent the evil of the immigration of Chinese laborers, which applies to such a case as this. If this petitioner had a right of domicile in this country, protected by the treaties, I cannot believe that the fact that he took a temporary journey across the line into Canada, with the intention of returning, has abrogated that right. Suppose that a Chinese merchant, domiciled for years in this country,

having acquired a fortune, should retire from business, and conclude to adopt this country as his permanent residence, or that a Chinese minister, sent to this country as a representative of his government, should determine, after the close of his official service, to establish his residence in this country, and continue to reside here for the rest of his life, which admittedly he would have a right to do under the treaties existing between this country and China. Such a person, by the supposition, would be no longer a merchant or an official, or within any of the classes designated in any of the treaties or laws as being entitled to enter. Can it be claimed that, if he ventured to take a temporary trip to Canada for a few days or weeks, or to Europe for a few months, he would thereby lose the right to return to his adopted home and to continue to reside in this country? I think that there is a radical distinction between the case of aliens domiciled in this country, and that of those seeking for the first time to enter this country. The United States Supreme Court, in the case of Lau Ow Bew v. United States, 144 U. S. 47, 61, 12 Sup. Ct. 517, 36 L. Ed. 340, states that:

"Chinese merchants domiciled in the United States, and in China only for temporary purposes, animo revertendi, do not appear to us to occupy the predicament of persons 'who shall be about to come to the United States,' when they start on their return to the country of their residence and business. The general terms used should be limited to those persons to whom Congress manifestly intended to apply them, and they would evidently be those who are about to come to the United States for the first time."

In my opinion, this language is equally applicable to persons other than merchants who have a right of domicile in this country under existing treaties and laws. See, also, United States v. Mrs. Gue Lim, 176 U. S. 459, 468, 20 Sup. Ct. 415, 44 L. Ed. 544.

It was held in United States v. Chin Fee (D. C.) 94 Fed. 828, that a Chinese physician, not a laborer, who resided in this country for several years, registered as permitted by the statute, and afterwards went to China temporarily, intending to return, was entitled to remain in the United States after his entry, although his occupation is not one of those stated, in terms, in the treaties or the rules.

The cases of United States v. Ah Fawn (D. C.) 57 Fed. 591, and Lee Ah Yin v. United States, 116 Fed. 614, 54 C. C. A. 70, cited in the decision of the Secretary of Commerce and Labor, do not seem to me to be applicable to this case. The case of United States v. Ah Fawn simply held that a Chinaman, who is described as a gambler and a criminal commonly called a "highbinder," although not technically a laborer, was included in the general term of "laborer," as employed in the treaties and acts of Congress. The case of Lee Ah Yin v. United States held that an immoral woman, although not technically a laborer, was included in the same class. Any general expressions in the opinions in those cases are to be construed in the light of the actual questions presented for determination.

I think that the existing treaties and laws did not authorize the establishment of rules preventing the return to this country of a Chinese person, not a laborer, who has a right of domicile in this country, and who has left it temporarily, with the intention of returning, and that the provisions of rules 1 and 2 of the Chinese regulations, which provide that

only Chinese persons of certain designated classes have a right to enter this country, are not applicable to the petitioner.

My conclusion is that the petitioner should be discharged from detention and permitted to enter this country.