## EX PARTE MITSUYE ENDO.

No. 70. Argued October 12, 1944.—Decided December 18, 1944.

284

*Mr. James C. Purcell,* with whom *Mr. Wayne M. Collins* was on the brief, for Mitsuye Endo.

*Solicitor General Fahy,* with whom *Assistant Attorney General Wechsler* and *Messrs. Edward J. Ennis, Ralph F. Fuchs,* and *John L. Burling* were on the brief, for the United States.

*Mr. Wayne M. Collins* filed a brief on behalf of the Northern California Branch of the American Civil Liberties Union; and *Messrs. Osmond K. Fraenkel, Edwin Borchard, Charles Horsky, Arthur DeHon Hill, Winthrop Wadleigh, Harold Evans, William Draper Lewis,* and *Thomas Raeburn White* on behalf of the American Civil Liberties Union, as *amici curiae,* in support of Mitsuye Endo.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This case comes here on a certificate of the Court of Appeals for the Ninth Circuit, certifying to us questions of law upon which it desires instructions for the decision of the case. Judicial Code § 239, 28 U. S. C. § 346. Acting under that section we ordered the entire record to be certified to this Court so that we might proceed to a decision, as if the case had been brought here by appeal.

Mitsuye Endo, hereinafter designated as the appellant, is an American citizen of Japanese ancestry. She was

evacuated from Sacramento, California, in 1942, pursuant to certain military orders which we will presently discuss, and was removed to the Tule Lake War Relocation Center located at Newell, Modoc County, California. In July, 1942, she filed a petition for a writ of habeas corpus in the District Court of the United States for the Northern District of California, asking that she be discharged and restored to liberty. That petition was denied by the District Court in July, 1943, and an appeal was perfected to the Circuit Court of Appeals in August, 1943. Shortly thereafter appellant was transferred from the Tule Lake Relocation Center to the Central Utah Relocation Center located at Topaz, Utah, where she is presently detained. The certificate of questions of law was filed here on April 22, 1944, and on May 8, 1944, we ordered the entire record to be certified to this Court. It does not appear that any respondent was ever served with process or appeared in the proceedings. But the United States Attorney for the Northern District of California argued before the District Court that the petition should not be granted. And the Solicitor General argued the case here.

The history of the evacuation of Japanese aliens and citizens of Japanese ancestry from the Pacific coastal regions, following the Japanese attack on our Naval Base at Pearl Harbor on December 7, 1941, and the declaration of war against Japan on December 8, 1941 (55 Stat. 795), has been reviewed in *Hirabayashi* v. *United States,* 320 U. S. 81. It need be only briefly recapitulated here. On February 19, 1942, the President promulgated Executive Order No. 9066, 7 Fed. Reg. 1407. It recited that "the successful prosecution of the war requires every possible protection against espionage and against sabotage to national-defense material, national-defense premises, and national-defense utilities, as defined in Section 4, Act of April 20, 1918, 40 Stat. 533, as amended by the Act of No-

vember 30, 1940, 54 Stat. 1220, and the Act of August 21, 1941, 55 Stat. 655 (U. S. C., Title 50, Sec. 104)."

And it authorized and directed

"the Secretary of War, and the Military Commanders whom he may from time to time designate, whenever he or any designated Commander deems such action necessary or desirable, to prescribe military areas in such places and of such extent as he or the appropriate Military Commander may determine, from which any or all persons may be excluded, and with respect to which, the right of any person to enter, remain in, or leave shall be subject to whatever restrictions the Secretary of War or the appropriate Military Commander may impose in his discretion. The Secretary of War is hereby authorized to provide for residents of any such area who are excluded therefrom, such transportation, food, shelter, and other accommodations as may be necessary, in the judgment of the Secretary of War or the said Military Commander, and until other arrangements are made, to accomplish the purpose of this order."

Lt. General J. L. De Witt, Military Commander of the Western Defense Command, was designated to carry out the duties prescribed by that Executive Order. On March 2, 1942, he promulgated Public Proclamation No. 1 (7 Fed. Reg. 2320) which recited that the entire Pacific Coast of the United States

"by its geographical location is particularly subject to attack, to attempted invasion by the armed forces of nations with which the United States is now at war, and, in connection therewith, is subject to espionage and acts of sabotage, thereby requiring the adoption of military measures necessary to establish safeguards against such enemy operations."

It designated certain Military Areas and Zones in the Western Defense Command and announced that certain persons might subsequently be excluded from these areas.

On March 16, 1942, General De Witt promulgated Public Proclamation No. 2 which contained similar recitals and designated further Military Areas and Zones. 7 Fed. Reg. 2405.

On March 18, 1942, the President promulgated Executive Order No. 9102 which established in the Office for Emergency Management of the Executive Office of the President the War Relocation Authority. 7 Fed. Reg. 2165. It recited that it was made "in order to provide for the removal from designated areas of persons whose removal is necessary in the interests of national security." It provided for a Director and authorized and directed him to "formulate and effectuate a program for the removal, from the areas designated from time to time by the Secretary of War or appropriate military commander under the authority of Executive Order No. 9066 of February 19, 1942, of the persons or classes of persons designated under such Executive Order, and for their relocation, maintenance, and supervision."

The Director was given the authority, among other things, to prescribe regulations necessary or desirable to promote effective execution of the program.

Congress shortly enacted legislation which, as we pointed out in *Hirabayashi* v. *United States, supra,* ratified and confirmed Executive Order No. 9066. See 320 U. S. pp. 87–91. It did so by the Act of March 21, 1942 (56 Stat. 173) which provided:

"That whoever shall enter, remain in, leave, or commit any act in any military area or military zone prescribed, under the authority of an Executive order of the President, by the Secretary of War, or by any military commander designated by the Secretary of War, contrary to the restrictions applicable to any such area or zone or contrary to the order of the Secretary of War or any such military commander, shall, if it appears that he knew or should

have known of the existence and extent of the restrictions or order and that his act was in violation thereof, be guilty of a misdemeanor and upon conviction shall be liable to a fine of not to exceed $5,000 or to imprisonment for not more than one year, or both, for each offense."

Beginning on March 24, 1942, a series of 108 Civilian Exclusion Orders [1] were issued by General De Witt pursuant to Public Proclamation Nos. 1 and 2. Appellant's exclusion was effected by Civilian Exclusion Order No. 52, dated May 7, 1942. It ordered that "all persons of Japanese ancestry, both alien and non-alien" be excluded from Sacramento, California,[2] beginning at noon on May 16, 1942. Appellant was evacuated to the Sacramento Assembly Center on May 15, 1942, and was transferred from there to the Tule Lake Relocation Center on June 19, 1942.

---

[1] Civilian Exclusion Orders Nos. 1 to 99 were ratified by General De Witt's Public Proclamation No. 7 of June 8, 1942 (7 Fed. Reg. 4498) and Nos. 100 to 108 were ratified by Public Proclamation No. 11 of August 18, 1942. 7 Fed. Reg. 6703.

[2] By Public Proclamation No. 4, dated March 27, 1942 (7 Fed. Reg. 2601) General De Witt had ordered that all persons of Japanese ancestry who were within the limits of Military Area No. 1 (which included the City of Sacramento) were prohibited "from leaving that area for any purpose until and to the extent that a future proclamation or order of this headquarters shall so permit or direct."

Prior to this Proclamation a system of voluntary migration had been in force under which 4,889 persons left the military areas under their own arrangements. Final Report, Japanese Evacuation from the West Coast (1943), p. 109. The following reasons are given for terminating that program:

"Essentially, the objective was twofold. First, it was to alleviate tension and prevent incidents involving violence between Japanese migrants and others. Second, it was to insure an orderly, supervised, and thoroughly controlled evacuation with adequate provision for the protection of the persons of evacuees as well as their property." Final Report, supra, p. 105.

On May 19, 1942, General De Witt promulgated Civilian Restrictive Order No. 1 (8 Fed. Reg. 982) and on June 27, 1942, Public Proclamation No. 8. 7 Fed. Reg. 8346. These prohibited evacuees from leaving Assembly Centers or Relocation Centers except pursuant to an authorization from General De Witt's headquarters. Public Proclamation No. 8 recited that "the present situation within these military areas requires as a matter of military necessity" that the evacuees be removed to "Relocation Centers for their relocation, maintenance and supervision," that those Relocation Centers be designated as War Relocation Project Areas, and that restrictions on the rights of the evacuees to enter, remain in, or leave such areas be promulgated. These restrictions were applicable to the Relocation Centers within the Western Defense Command [3] and included both of those in which appellant has been confined—Tule Lake Relocation Center at Newell, California and Central Utah Relocation Center at Topaz, Utah. And Public Proclamation No. 8 purported to make any person who was subject to its provisions and who failed to conform to it liable to the penalties prescribed by the Act of March 21, 1942.

[3] Six War Relocation Centers and Project Areas were established within and four outside the Western Defense Command. See Final Report, *supra*, note 2, Part VI. Each one which was outside the Western Defense Command was designated as a military area by the Secretary of War in Public Proclamation No. WD1, dated August 13, 1942. That proclamation provided that all persons of Japanese ancestry in those areas were required to remain there unless written authorization to leave was obtained from the Secretary of War or the Director of the War Relocation Authority. 7 Fed. Reg. 6593. It recited that the United States was subject to "espionage and acts of sabotage, thereby requiring the adoption of military measures necessary to establish safeguards against such enemy operations emanating from within as well as from without the national boundaries." And it also purported to make any person who was subject to its provisions and who failed to obey it liable to the penalties prescribed by the Act of March 21, 1942.

By letter of August 11, 1942, General De Witt author-
ized the War Relocation Authority [4] to issue permits for
persons to leave these areas. By virtue of that delega-
tion [5] and the authority conferred by Executive Order No.
9102, the War Relocation Authority was given control
over the ingress and egress of evacuees from the Relocation
Centers where Mitsuye Endo was confined. [6]

---

[4] The letter of August 11, 1942, is printed in the Final Report, *supra,*
note 2, p. 530. It recited that the delegation of authority was made
pursuant to provisions of Public Proclamation No. 8, dated June 27,
1942. Later General De Witt described the supervision of Relocation
Centers by the War Relocation Authority as follows:

"The initial problem was one of security—the security of the Pacific
Coast. The problem was met by evacuation to Assembly Centers fol-
lowed by a transfer to Relocation Centers. The latter phase—con-
struction, supply, equipment of Relocation Centers and the transfer
of evacuees from Assembly to Relocation Centers had been accom-
plished by the Army. (While the Commanding General was made
responsible for this latter phase of the program, in so doing, he was
accomplishing a mission of the War Relocation Authority rather than
strictly an Army mission.) The second problem—national in scope—
essentially a social-economic problem, was primarily for solution by
the War Relocation Authority, an agency expressly created for that
purpose."

Final Report, *supra,* note 2, p. 246.

On February 16, 1944, the President by Executive Order No. 9423
transferred the War Relocation Authority to the Department of the
Interior. 9 Fed. Reg. 1903. The Secretary of the Interior by Ad-
ministrative Order No. 1922, dated February 16, 1944, authorized
the Director to perform under the Secretary's supervision and direc-
tion the functions transferred to the Department by Executive Or-
der No. 9423.

[5] And see the delegation of authority contained in the Secretary of
War's Proclamation WD1 of August 13, 1942, *supra,* note 3, respecting
Relocation Centers outside the Western Defense Command.

[6] The Commanding General retained exclusive jurisdiction over the
release of evacuees for the purpose of employment, resettlement, or
residence within Military Area No. 1 and the California portion of
Military Area No. 2. See Final Report, *supra,* note 2, p. 242. As to
the Relocation Centers situated within the evacuated zone, the Com-

The program of the War Relocation Authority is said to have three main features: (1) the maintenance of Relocation Centers as interim places of residence for evacuees; (2) the segregation of loyal from disloyal evacuees; (3) the continued detention of the disloyal and so far as possible the relocation of the loyal in selected communities.[7] In connection with the latter phase of its work the War Relocation Authority established a procedure for obtaining leave from Relocation Centers. That procedure, so far as indefinite leave[8] is concerned, presently provides[9] as follows:

---

manding General regulated "the conditions of travel and movement through the area." *Id.*

"The Commanding General recognized fully that one of the principal responsibilities of War Relocation Authority was properly to control ingress and egress at Relocation Centers. The exercise of such control by Army authorities would have been tantamount to administering the Centers themselves. While the Commanding General retained exclusive control to regulate and prohibit the entry or movement of any Japanese in the evacuated areas, he delegated fully the authority and responsibility to determine entry to and departure from the Center proper." *Id.*

[7] The functioning of Relocation Centers is described in the Final Report, *supra,* note 2, Part VI and in Segregation of Loyal and Disloyal Japanese in Relocation Centers, Sen. Doc. No. 96, 78th Cong., 1st Sess., pp. 4–25.

[8] Provision was also made for group-leave (or seasonal-work leave) and short term leave not to exceed 60 days. See Sen. Doc. No. 96, *supra,* note 7, p. 17.

[9] The first leave procedure was contained in Administrative Instruction No. 22, dated July 20, 1942. It provided in short that any citizen of Japanese ancestry who had never resided or been educated in Japan could apply for a permit to leave the Relocation Center if he could show that he had a specific job opportunity at a designated place outside the Relocation Center and outside the Western Defense Command. Every permittee was said to remain in the "constructive custody" of the military commander in whose jurisdiction the Relocation Center was located. The permit could be revoked by the Director and the permittee required to return to the Relocation Center

292

Application for leave clearance is required. An investigation of the applicant is made for the purpose of ascertaining "the probable effect upon the war program and upon the public peace and security of issuing indefinite leave" to the applicant.[10] The grant of leave clearance does not authorize departure from the Relocation Center. Application for indefinite leave must also be made. Indefinite leave may be granted under 14 specified conditions.[11] For example, it may be granted (1) where the applicant proposes to accept an employment offer or an offer of support that has been investigated and approved by the Authority; or (2) where the applicant does not intend to work but has "adequate financial resources to take care of himself" and a Relocation Officer has investigated and approved "public sentiment at his proposed destination," or (3) where the applicant has made arrangements to live at a hotel or in a private home approved by a Relo-

---

if the Director found that the revocation was necessary "in the public interest." The Regulations of September 26, 1942, provided more detailed procedures for obtaining leave. See 7 Fed. Reg. 7656. Administrative Instruction No. 22 was revised November 6, 1942. It was superseded as a supplement to the Regulations by the Handbook of July 20, 1943. The Regulations of September 26, 1942 were revised January 1, 1944. See 9 Fed. Reg. 154.

[10] Handbook, § 60.6.6. Nine factors are specified each of which is "regarded by intelligence agencies as sufficient to warrant a recommendation that leave clearance be denied unless there is an adequate explanation." § 60.10.2. These include, among others, a failure or refusal to swear unqualified allegiance to the United States and to forswear any form of allegiance to the Japanese Emperor or any other foreign government, power, or organization; a request for repatriation or expatriation whether or not subsequently retracted; military training in Japan; employment on Japanese naval vessels; three trips to Japan after the age of six, except in the case of seamen whose trips were confined to ports of call; an organizer, agent, member, or contributor to specified organizations which intelligence agencies consider subversive.

[11] Handbook, § 60.4.3.

cation Officer while arranging for employment; or (4) where the applicant proposes to accept employment by a federal or local governmental agency; or (5) where the applicant is going to live with designated classes of relatives.

But even if an applicant meets those requirements, no leave will issue when the proposed place of residence or employment is within a locality where it has been ascertained that "community sentiment is unfavorable" or when the applicant plans to go to an area which has been closed by the Authority to the issuance of indefinite leave.[12] Nor will such leave issue if the area where the applicant plans to reside or work is one which has not been cleared for relocation.[13] Moreover, the applicant agrees to give the Authority prompt notice of any change of employment or residence. And the indefinite leave which is granted does not permit entry into a prohibited military area, including those from which these people were evacuated.[14]

Mitsuye Endo made application for leave clearance on February 19, 1943, after the petition was filed in the Dis-

---

[12] *Id.*

[13] *Id.* The War Relocation Authority also recommends communities in which an evacuee will be accepted, renders aid in finding employment opportunities, and provides cash grants, if needed, to assist the evacuee in reaching a specified destination and in becoming established there. The Authority has established eight area offices and twenty-six district offices to help carry out the relocation program.

[14] Sec. 60.4.8 of the Handbook provides:
"Before any indefinite leave permitting any entry into or travel in a prohibited military area may issue, a written pass or authorization shall be procured for the applicant from the appropriate military authorities and an escort shall be provided if required by the military authorities. Such pass or authorization may be procured through the Assistant Director in San Francisco, or in the case of the Manzanar Relocation Center through the commanding officer of the military police at the center to the extent authorized by the Western Defense Command."

trict Court. Leave clearance [15] was granted her on August 16, 1943. But she made no application for indefinite leave.[16]

Her petition for a writ of *habeas corpus* alleges that she is a loyal and law-abiding citizen of the United States, that no charge has been made against her, that she is being unlawfully detained, and that she is confined in the Relocation Center under armed guard and held there against her will.

It is conceded by the Department of Justice and by the War Relocation Authority that appellant is a loyal and law-abiding citizen. They make no claim that she is detained on any charge or that she is even suspected of disloyalty. Moreover, they do not contend that she may

---

[15] The leave clearance stated that it did not authorize departure from the Relocation Center. It added:

"You are eligible for indefinite leave for the purpose of employment or residence in the Eastern Defense Command as well as in other areas; provided the provisions of Administrative Instruction No. 22, Rev., are otherwise complied with. The Provost Marshal General's Dept. of the War Department has determined that you, Endo Mitsuye are not at this time eligible for employment in plants and facilities vital to the war effort."

[16] The form of a citizen's indefinite leave is as follows:

"This is to certify that ................ a United States citizen, who has submitted to me sufficient proof of such citizenship, residing within ............ Relocation Area, is allowed to leave such area on ............ 19.., and subject to the terms of the regulations of the War Relocation Authority relating to the issuance of leave for departure from a relocation area and subject to restrictions ordered by the United States Army, and subject to any special conditions or restrictions set forth on the reverse side hereof, to enjoy leave of indefinite duration."

One of the grounds given by the District Court for denial of the petition for writ of *habeas corpus* was the failure of appellant to exhaust her administrative remedies. The Solicitor General and the War Relocation Authority do not invoke that rule here, since the issue which appellant poses is the validity of the regulations under which the administrative remedy is prescribed.

be held any longer in the Relocation Center. They concede that it is beyond the power of the War Relocation Authority to detain citizens against whom no charges of disloyalty or subversiveness have been made for a period longer than that necessary to separate the loyal from the disloyal and to provide the necessary guidance for relocation. But they maintain that detention for an additional period after leave clearance has been granted is an essential step in the evacuation program. Reliance for that conclusion is placed on the following circumstances.

When compulsory evacuation from the West Coast was decided upon, plans for taking care of the evacuees after their detention in the Assembly Centers, to which they were initially removed, remained to be determined. On April 7, 1942, the Director of the Authority held a conference in Salt Lake City with various state and federal officials including the Governors of the intermountain states. "Strong opposition was expressed to any type of unsupervised relocation and some of the Governors refused to be responsible for maintenance of law and order unless evacuees brought into their States were kept under constant military surveillance." [17] Sen. Doc. No. 96, *supra*, note 7, p. 4. As stated by General De Witt in his report to the Chief of Staff:

"Essentially, military necessity required only that the Japanese population be removed from the coastal area and dispersed in the interior, where the danger of action in concert during any attempted enemy raids along the coast, or in advance thereof as preparation for a full scale attack, would be eliminated. That the evacuation program necessarily and ultimately developed into one of complete Federal supervision, was due primarily to the

---

[17] Cf. the account of the meeting by General De Witt in the Final Report, *supra*, note 2, pp. 243–244.

fact that the interior states would not accept an uncontrolled Japanese migration."

Final Report, *supra,* note 2, pp. 43–44. The Authority thereupon abandoned plans for assisting groups of evacuees in private colonization and temporarily put to one side plans for aiding the evacuees in obtaining private employment.[18] As an alternative the Authority "concentrated on establishment of Government-operated centers with sufficient capacity and facilities to accommodate the entire evacuee population." Sen. Doc. No. 96, *supra,* note 7, p. 4. Accordingly, it undertook to care for the basic needs of these people in the Relocation Centers, to promote as rapidly as possible the permanent resettlement of as many as possible in normal communities, and to provide indefinitely for those left at the Relocation Centers. An effort was made to segregate the loyal evacuees from the others. The leave program which we have discussed was put into operation and the resettlement program commenced.[19]

It is argued that such a planned and orderly relocation was essential to the success of the evacuation program; that but for such supervision there might have been a

---

[18] And see the Fourth Interim Report of the Tolan Committee, H. R. Rep. No. 2124, 77th Cong., 2d Sess., p. 18.

[19] There were 108,503 evacuees transferred to Relocation Centers. Final Report, *supra,* note 2, p. 279. As of July 29, 1944, there were 28,911 on indefinite leave and 61,002 in the Relocation Centers other than Tule Lake. It was sought to assemble at Tule Lake those whose disloyalty was deemed to be established and those who persisted in a refusal to say they would be willing to serve in the armed forces of the United States on combat duty wherever ordered and to swear unqualified allegiance to the United States and forswear any form of allegiance to the Japanese Emperor or any other foreign government, power or organization. This group, together with minor children, totaled 18,684 on July 29, 1944. And see Hearings, Subcommittee on the National War Agencies Appropriation Bill for 1945, p. 611.

dangerously disorderly migration of unwanted people to unprepared communities; that unsupervised evacuation might have resulted in hardship and disorder; that the success of the evacuation program was thought to require the knowledge that the federal government was maintaining control over the evacuated population except as the release of individuals could be effected consistently with their own peace and well-being and that of the nation; that although community hostility towards the evacuees has diminished, it has not disappeared and the continuing control of the Authority over the relocation process is essential to the success of the evacuation program. It is argued that supervised relocation, as the chosen method of terminating the evacuation, is the final step in the entire process and is a consequence of the first step taken. It is conceded that appellant's detention pending compliance with the leave regulations is not directly connected with the prevention of espionage and sabotage at the present time. But it is argued that Executive Order No. 9102 confers power to make regulations necessary and proper for controlling situations created by the exercise of the powers expressly conferred for protection against espionage and sabotage. The leave regulations are said to fall within that category.

*First.* We are of the view that Mitsuye Endo should be given her liberty. In reaching that conclusion we do not come to the underlying constitutional issues which have been argued. For we conclude that, whatever power the War Relocation Authority may have to detain other classes of citizens, it has no authority to subject citizens who are concededly loyal to its leave procedure.

It should be noted at the outset that we do not have here a question such as was presented in *Ex parte Milligan,* 4 Wall. 2, or in *Ex parte Quirin,* 317 U. S. 1, where the jurisdiction of military tribunals to try persons according to the law of war was challenged in *habeas corpus* pro-

ceedings. Mitsuye Endo is detained by a civilian agency, the War Relocation Authority, not by the military. Moreover, the evacuation program was not left exclusively to the military; the Authority was given a large measure of responsibility for its execution and Congress made its enforcement subject to civil penalties by the Act of March 21, 1942. Accordingly, no questions of military law are involved.

Such power of detention as the Authority has stems from Executive Order No. 9066. That order is the source of the authority [20] delegated by General De Witt in his letter of August 11, 1942. And Executive Order No. 9102 which created the War Relocation Authority purported to do no more than to implement the program authorized by Executive Order No. 9066.

We approach the construction of Executive Order No. 9066 as we would approach the construction of legislation in this field. That Executive Order must indeed be considered along with the Act of March 21, 1942, which ratified and confirmed it (*Hirabayashi* v. *United States, supra,* pp. 87–91) as the Order and the statute together laid such basis as there is for participation by civil agencies of the federal government in the evacuation program. Broad powers frequently granted to the President or other executive officers by Congress so that they may deal with the exigencies of wartime problems have been sustained.[21] And the Constitution when it committed to the Executive and to Congress the exercise of the war power necessarily gave them wide scope for the exercise of judgment and

---

[20] Insofar as Public Proclamation No. WD1, dated August 13, 1942, *supra,* note 3, might be deemed relevant, it is not applicable here since the Relocation Centers with which we are presently concerned were within the Western Defense Command.

[21] See, for example, *United States* v. *Chemical Foundation,* 272 U. S. 1, 12; *United States* v. *Curtiss-Wright Corp.,* 299 U. S. 304; *Yakus* v. *United States,* 321 U. S. 414; *Bowles* v. *Willingham,* 321 U. S. 503.

discretion so that war might be waged effectively and successfully. *Hirabayashi* v. *United States, supra,* p. 93. At the same time, however, the Constitution is as specific in its enumeration of many of the civil rights of the individual as it is in its enumeration of the powers of his government. Thus it has prescribed procedural safeguards surrounding the arrest, detention and conviction of individuals. Some of these are contained in the Sixth Amendment, compliance with which is essential if convictions are to be sustained. *Tot* v. *United States,* 319 U. S. 463. And the Fifth Amendment provides that no person shall be deprived of liberty (as well as life or property) without due process of law. Moreover, as a further safeguard against invasion of the basic civil rights of the individual it is provided in Art. I, § 9 of the Constitution that "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." See *Ex parte Milligan, supra.*

We mention these constitutional provisions not to stir the constitutional issues which have been argued at the bar but to indicate the approach which we think should be made to an Act of Congress or an order of the Chief Executive that touches the sensitive area of rights specifically guaranteed by the Constitution. This Court has quite consistently given a narrower scope for the operation of the presumption of constitutionality when legislation appeared on its face to violate a specific prohibition of the Constitution.[22] We have likewise favored that interpretation of legislation which gives it the greater chance of surviving the test of constitutionality.[23] Those

[22] *Stromberg* v. *California,* 283 U. S. 359; *Lovell* v. *Griffin,* 303 U. S. 444; *Hague* v. *C. I. O.,* 307 U. S. 496; *Schneider* v. *State,* 308 U. S. 147; *Cantwell* v. *Connecticut,* 310 U. S. 296.

[23] *United States* v. *Shreveport Grain & Elevator Co.,* 287 U. S. 77, 82; *Interstate Commerce Commission* v. *Oregon-Washington R. & N. Co.,* 288 U. S. 14, 40; *Ashwander* v. *Tennessee Valley Authority,* 297

analogies are suggestive here. We must assume that the Chief Executive and members of Congress, as well as the courts, are sensitive to and respectful of the liberties of the citizen. In interpreting a wartime measure we must assume that their purpose was to allow for the greatest possible accommodation between those liberties and the exigencies of war. We must assume, when asked to find implied powers in a grant of legislative or executive authority, that the law makers intended to place no greater restraint on the citizen than was clearly and unmistakably indicated by the language they used.

The Act of March 21, 1942, was a war measure. The House Report (H. Rep. No. 1906, 77th Cong., 2d Sess., p. 2) stated, "The necessity for this legislation arose from the fact that the safe conduct of the war requires the fullest possible protection against either espionage or sabotage to national defense material, national defense premises, and national defense utilities." That was the precise purpose of Executive Order No. 9066, for, as we have seen, it gave as the reason for the exclusion of persons from prescribed military areas the protection of such property "against espionage and against sabotage." And Executive Order No. 9102 which established the War Relocation Authority did so, as we have noted, "in order to provide for the removal from designated areas of persons whose removal is necessary in the interests of national security." The purpose and objective of the Act and of these orders are plain. Their single aim was the protection of the war effort against espionage and sabotage. It is in light of that one objective that the powers conferred by the orders must be construed.

Neither the Act nor the orders use the language of detention. The Act says that no one shall "enter, re-

---

U. S. 288, 348; *Labor Board* v. *Jones & Laughlin Corp.*, 301 U. S. 1, 30; *Anniston Mfg. Co.* v. *Davis*, 301 U. S. 337, 351–352.

main in, leave, or commit any act" in the prescribed military areas contrary to the applicable restrictions. Executive Order No. 9066 subjects the right of any person "to enter, remain in, or leave" those prescribed areas to such restrictions as the military may impose. And apart from those restrictions the Secretary of War is only given authority to afford the evacuees "transportation, food, shelter, and other accommodations." Executive Order No. 9102 authorizes and directs the War Relocation Authority "to formulate and effectuate a program for the removal" of the persons covered by Executive Order No. 9066 from the prescribed military areas and "for their relocation, maintenance, and supervision." And power is given the Authority to make regulations "necessary or desirable to promote effective execution of such program." Moreover, unlike the case of curfew regulations (*Hirabayashi* v. *United States, supra*), the legislative history of the Act of March 21, 1942, is silent on detention. And that silence may have special significance in view of the fact that detention in Relocation Centers was no part of the original program of evacuation but developed later to meet what seemed to the officials in charge to be mounting hostility to the evacuees on the part of the communities where they sought to go.

We do not mean to imply that detention in connection with no phase of the evacuation program would be lawful. The fact that the Act and the orders are silent on detention does not of course mean that any power to detain is lacking. Some such power might indeed be necessary to the successful operation of the evacuation program. At least we may so assume. Moreover, we may assume for the purposes of this case that initial detention in Relocation Centers was authorized. But we stress the silence of the legislative history and of the Act and the Executive Orders on the power to detain to emphasize that any such authority which exists must be implied. If there is to be

the greatest possible accommodation of the liberties of the citizen with this war measure, any such implied power must be narrowly confined to the precise purpose of the evacuation program.

A citizen who is concededly loyal presents no problem of espionage or sabotage. Loyalty is a matter of the heart and mind, not of race, creed, or color. He who is loyal is by definition not a spy or a saboteur. When the power to detain is derived from the power to protect the war effort against espionage and sabotage, detention which has no relationship to that objective is unauthorized.

Nor may the power to detain an admittedly loyal citizen or to grant him a conditional release be implied as a useful or convenient step in the evacuation program, whatever authority might be implied in case of those whose loyalty was not conceded or established. If we assume (as we do) that the original evacuation was justified, its lawful character was derived from the fact that it was an espionage and sabotage measure, not that there was community hostility to this group of American citizens. The evacuation program rested explicitly on the former ground not on the latter as the underlying legislation shows. The authority to detain a citizen or to grant him a conditional release as protection against espionage or sabotage is exhausted at least when his loyalty is conceded. If we held that the authority to detain continued thereafter, we would transform an espionage or sabotage measure into something else. That was not done by Executive Order No. 9066 or by the Act of March 21, 1942, which ratified it. What they did not do we cannot do. Detention which furthered the campaign against espionage and sabotage would be one thing. But detention which has no relationship to that campaign is of a distinct character. Community hostility even to loyal evacuees may have been (and perhaps still is) a serious problem. But if au-

thority for their custody and supervision is to be sought on that ground, the Act of March 21, 1942, Executive Order No. 9066, and Executive Order No. 9102, offer no support. And none other is advanced.[24] To read them that broadly would be to assume that the Congress and the President intended that this discriminatory action should

[24] It is argued, to be sure, that there has been Congressional ratification of the detention of loyal evacuees under the leave regulations of the Authority through the appropriation of sums for the expenses of the Authority. 57 Stat. 533, P. L. 139, 78th Cong., 1st Sess., approved July 12, 1943 and 58 Stat. 545, P. L. 372, 78th Cong., 2d Sess., approved June 28, 1944. It is pointed out that the regulations and procedures of the Authority were disclosed in reports to the Congress and in Congressional hearings. See, for example, Sen. Doc. No. 96, *supra*, note 7; Report and Minority Views of the Special Committee on Un-American Activities on Japanese War Relocation Centers, H. Rep. No. 717, 78th Cong., 1st Sess., pp. 23–26; Hearings, Subcommittee of the Senate Military Affairs Committee on S. 444, 78th Cong., 1st Sess., pp. 45–46; Japanese War Relocation Centers, Subcommittee Report on S. 444 and S. 101 and 111, 78th Cong., 1st Sess., pp. 4–5 *et seq.* And it is shown that the leave program of the Authority was mentioned both in the House and Senate committee hearings on the 1944 Appropriation Act (Hearings, Subcommittee of the House Committee on Appropriations, National War Agencies Appropriation Bill for 1944, 78th Cong., 1st Sess., pp. 698, 699, 710; Hearings of the Senate Subcommittee on Appropriations, National War Agencies Appropriation Bill for 1944, 78th Cong., 1st Sess., p. 382) and on the floor of the House prior to passage of the 1944 Act. 89 Cong. Rec. pp. 5983–5985. Congress may of course do by ratification what it might have authorized. *Swayne & Hoyt* v. *United States*, 300 U. S. 297, 301–302. And ratification may be effected through appropriation acts. *Isbrandtsen-Moller Co.* v. *United States*, 300 U. S. 139, 147; *Brooks* v. *Dewar*, 313 U. S. 354, 361. But the appropriation must plainly show a purpose to bestow the precise authority which is claimed. We can hardly deduce such a purpose here where a lump appropriation was made for the overall program of the Authority and no sums were earmarked for the single phase of the total program which is here involved. Congress may support the effort to take care of these evacuees without ratifying every phase of the program.

be taken against these people wholly on account of their ancestry even though the government conceded their loyalty to this country. We cannot make such an assumption. As the President has said of these loyal citizens: "Americans of Japanese ancestry, like those of many other ancestries, have shown that they can, and want to, accept our institutions and work loyally with the rest of us, making their own valuable contribution to the national wealth and well-being. In vindication of the very ideals for which we are fighting this war it is important to us to maintain a high standard of fair, considerate, and equal treatment for the people of this minority as of all other minorities." Sen. Doc. No. 96, *supra,* note 7, p. 2.

Mitsuye Endo is entitled to an unconditional release by the War Relocation Authority.

*Second.* The question remains whether the District Court has jurisdiction to grant the writ of *habeas corpus* because of the fact that while the case was pending in the Circuit Court of Appeals appellant was moved from the Tule Lake Relocation Center in the Northern District of California where she was originally detained to the Central Utah Relocation Center in a different district and circuit.

That question is not colored by any purpose to effectuate a removal in evasion of the *habeas corpus* proceedings. It appears that appellant's removal to Utah was part of a general segregation program involving many of these people and was in no way related to this pending case. Moreover, there is no suggestion that there is no one within the jurisdiction of the District Court who is responsible for the detention of appellant and who would be an appropriate respondent. We are indeed advised by the Acting Secretary of the Interior [25] that if the writ

---

[25] In a letter dated October 13, 1944 to the Solicitor General and filed here.

issues and is directed to the Secretary of the Interior or any official of the War Relocation Authority (including an assistant director whose office is at San Francisco, which is in the jurisdiction of the District Court), the corpus of appellant will be produced and the court's order complied with in all respects. Thus it would seem that the case is not moot.

In *United States ex rel. Innes* v. *Crystal,* 319 U. S. 755, the relator challenged a judgment of court martial by *habeas corpus.* The District Court denied his petition and the Circuit Court of Appeals affirmed that order. After that decision and before his petition for certiorari was filed here, he was removed from the custody of the Army to a federal penitentiary in a different district and circuit. The sole respondent was the commanding officer. Only an order directed to the warden of the penitentiary could effectuate his discharge and the warden as well as the prisoner was outside the territorial jurisdiction of the District Court. We therefore held the cause moot. There is no comparable situation here.

The fact that no respondent was ever served with process or appeared in the proceedings is not important. The United States resists the issuance of a writ. A cause exists in that state of the proceedings and an appeal lies from denial of a writ without the appearance of a respondent. *Ex parte Milligan, supra,* p. 112; *Ex parte Quirin,* 317 U. S. 1, 24.

Hence, so far as presently appears, the cause is not moot and the District Court has jurisdiction to act unless the physical presence of appellant in that district is essential.

We need not decide whether the presence of the person detained within the territorial jurisdiction of the District Court is prerequisite to filing a petition for a writ of *habeas corpus.* See *In re Boles,* 48 F. 75; *Ex parte Gouyet,* 175 F. 230, 233; *United States* v. *Day,* 50 F. 2d 816, 817;

*United States* v. *Schlotfeldt,* 136 F. 2d 935, 940. But see *Tippitt* v. *Wood,* 140 F. 2d 689, 693. We only hold that the District Court acquired jurisdiction in this case and that the removal of Mitsuye Endo did not cause it to lose jurisdiction where a person in whose custody she is remains within the district.

There are expressions in some of the cases which indicate that the place of confinement must be within the court's territorial jurisdiction in order to enable it to issue the writ. See *In re Boles, supra,* p. 76; *Ex parte Gouyet, supra; United States* v. *Day, supra; United States* v. *Schlotfeldt, supra.* But we are of the view that the court may act if there is a respondent within reach of its process who has custody of the petitioner. As Judge Cooley stated in *In the Matter of Samuel W. Jackson,* 15 Mich. 417, 439–440:

"The important fact to be observed in regard to the mode of procedure upon this writ is, that it is directed to, and served upon, not the person confined, but his jailer. It does not reach the former except through the latter. The officer or person who serves it does not unbar the prison doors, and set the prisoner free, but the court relieves him by compelling the oppressor to release his constraint. The whole force of the writ is spent upon the respondent;"

And see *United States* v. *Davis,* 5 Cranch C. C. 622, Fed. Cas. No. 14,926; *Ex parte Fong Yim,* 134 F. 938; *Ex parte Ng Quong Ming,* 135 F. 378, 379; *Sanders* v. *Allen,* 100 F. 2d 717, 719; *Rivers* v. *Mitchell,* 57 Ia. 193, 195, 10 N. W. 626; *People* v. *New York Asylum,* 57 App. Div. 383, 384, 68 N. Y. S. 279; *People* v. *New York Asylum,* 58 App. Div. 133, 134, 68 N. Y. S. 656. The statute upon which the jurisdiction of the District Court in *habeas corpus* proceedings rests (Rev. Stat. § 752, 28 U. S. C. § 452) gives it power "to grant writs of habeas corpus for the purpose of

an inquiry into the cause of restraint of liberty."[26] That objective may be in no way impaired or defeated by the removal of the prisoner from the territorial jurisdiction of the District Court. That end may be served and the decree of the court made effective if a respondent who has custody of the prisoner is within reach of the court's process even though the prisoner has been removed from the district since the suit was begun.[27]

The judgment is reversed and the cause is remanded to the District Court for proceedings in conformity with this opinion.

*Reversed.*

Mr. Justice Murphy, concurring.

I join in the opinion of the Court, but I am of the view that detention in Relocation Centers of persons of Japanese ancestry regardless of loyalty is not only unauthorized by Congress or the Executive but is another example of the unconstitutional resort to racism inherent in the entire evacuation program. As stated more fully in my

---

[26] The entire section provides:

"The several justices of the Supreme Court and the several judges of the circuit courts of appeal and of the district courts, within their respective jurisdictions, shall have power to grant writs of habeas corpus for the purpose of an inquiry into the cause of restraint of liberty. A circuit judge shall have the same power to grant writs of habeas corpus within his circuit, that a district judge has within his district; and the order of the circuit judge shall be entered in the records of the district court of the district wherein the restraint complained of is had."

The last clause was added by § 6 of the Act of February 13, 1925, 43 Stat. 940. But we find no indication that it was added to change the scope of jurisdiction in habeas corpus proceedings. On its face it is no more than a recording requirement.

[27] Cf. Rule 45 (1) of this Court which provides: "Pending review of a decision refusing a writ of habeas corpus, the custody of the prisoner shall not be disturbed."

dissenting opinion in *Korematsu* v. *United States, ante,* p. 233, racial discrimination of this nature bears no reasonable relation to military necessity and is utterly foreign to the ideals and traditions of the American people.

Moreover, the Court holds that Mitsuye Endo is entitled to an unconditional release by the War Relocation Authority. It appears that Miss Endo desires to return to Sacramento, California, from which Public Proclamations Nos. 7 and 11, as well as Civilian Exclusion Order No. 52, still exclude her. And it would seem to me that the "unconditional" release to be given Miss Endo necessarily implies "the right to pass freely from state to state," including the right to move freely into California. *Twining* v. *New Jersey,* 211 U. S. 78, 97; *Crandall* v. *Nevada,* 6 Wall. 35. If, as I believe, the military orders excluding her from California were invalid at the time they were issued, they are increasingly objectionable at this late date, when the threat of invasion of the Pacific Coast and the fears of sabotage and espionage have greatly diminished. For the Government to suggest under these circumstances that the presence of Japanese blood in a loyal American citizen might be enough to warrant her exclusion from a place where she would otherwise have a right to go is a position I cannot sanction.

MR. JUSTICE ROBERTS.

I concur in the result but I cannot agree with the reasons stated in the opinion of the court for reaching that result.

As in *Korematsu* v. *United States, ante,* p. 214, the court endeavors to avoid constitutional issues which are necessarily involved. The opinion, at great length, attempts to show that neither the executive nor the legislative arm of the Government authorized the detention of the relator.

1. With respect to the executive, it is said that none of the executive orders in question specifically referred to detention and the court should not imply any authoriza-

tion of it. This seems to me to ignore patent facts. As the opinion discloses, the executive branch of the Government not only was aware of what was being done but in fact that which was done was formulated in regulations and in a so-called handbook open to the public. I had supposed that where thus overtly and avowedly a department of the Government adopts a course of action under a series of official regulations the presumption is that, in this way, the department asserts its belief in the legality and validity of what it is doing. I think it inadmissible to suggest that some inferior public servant exceeded the authority granted by executive order in this case. Such a basis of decision will render easy the evasion of law and the violation of constitutional rights, for when conduct is called in question the obvious response will be that, however much the superior executive officials knew, understood, and approved the conduct of their subordinates, those subordinates in fact lacked a definite mandate so to act. It is to hide one's head in the sand to assert that the detention of relator resulted from an excess of authority by subordinate officials.

2. As the opinion states, the Act of March 21, 1942, said nothing of detention or imprisonment, nor did Executive Order No. 9066 of date February 19, 1942, but I cannot agree that when Congress made appropriations to the Relocation Authority, having before it the reports, the testimony at committee hearings, and the full details of the procedure of the Relocation Authority were exposed in Government publications, these appropriations were not a ratification and an authorization of what was being done. The cases cited in footnote No. 24 of the opinion do not justify any such conclusion. The decision now adds an element never before thought essential to congressional ratification, namely, that if Congress is to ratify by appropriation any part of the programme of an executive agency the bill must include a specific item referring to that portion of the programme. In other words, the court

will not assume that Congress ratified the procedure of the authorities in this case in the absence of some such item as this in the appropriation bill:—"For the administration of the conditional release and parole programme in force in relocation centers." In the light of the knowledge Congress had as to the details of the programme, I think the court is unjustified in straining to conclude that Congress did not mean to ratify what was being done.

3. I conclude, therefore, that the court is squarely faced with a serious constitutional question,—whether the relator's detention violated the guarantees of the Bill of Rights of the federal Constitution and especially the guarantee of due process of law. There can be but one answer to that question. An admittedly loyal citizen has been deprived of her liberty for a period of years. Under the Constitution she should be free to come and go as she pleases. Instead, her liberty of motion and other innocent activities have been prohibited and conditioned. She should be discharged.