# United States Court of Appeals
## For The District of Columbia Circuit
_____

No. 05-5224

September Term 2010

04cv01254

**Filed On:** January 11, 2011

Mahmoad Abdah, Detainee, Camp Delta, et al.,

      Appellees

    v.

Barack Obama, President of the United States, et al.,

      Appellants

-----------------------------
Consolidated with 05-5225, 05-5227, 05-5229, 05-5230, 05-5232, 05-5235, 05-5236, 05-5237, 05-5238, 05-5239, 05-5242, 05-5243, 05-5244, 05-5246, 05-5248, 05-5337, 05-5338, 05-5374, 05-5390, 05-5398, 05-5479, 05-5484, 05-5486, 06-5037, 06-5041, 06-5043, 06-5062, 06-5065, 06-5094

**BEFORE:**    Sentelle, Chief Judge, and Ginsburg, Henderson, Rogers, Tatel, Garland, Brown, Griffith, and Kavanaugh, Circuit Judges

## O R D E R

Appellees' petition for initial en banc hearing and the response thereto were circulated to the full court, and a vote was requested. Thereafter, a majority of the judges eligible to participate did not vote in favor of the petition. Upon consideration of the foregoing, it is

**ORDERED** that the petition be denied.

                    **FOR THE COURT:**
                    Mark J. Langer, Clerk

          BY:    /s/
                 Michael C. McGrail
                 Deputy Clerk

* Circuit Judges Rogers, Tatel, and Griffith would grant the petition.

* A statement by Circuit Judge Griffith, with whom Circuit Judges Rogers and Tatel join, dissenting from the denial of initial en banc hearing, is attached.

GRIFFITH, *Circuit Judge*, with whom *Circuit Judges* ROGERS and TATEL join, dissenting: I dissent from the denial of en banc hearing because I believe the Suspension Clause, as construed by the Supreme Court in *Boumediene v. Bush*, 553 U.S. 723 (2008), entitles detainees at Guantanamo Bay to notice of transfers that will take them beyond the reach of the writ of habeas corpus. The petitioners ask us to reexamine our ruling to the contrary in *Kiyemba v. Obama* (*Kiyemba II*), 561 F.3d 509 (D.C. Cir. 2009). We should oblige.

As I expressed in my dissent in *Kiyemba II*, faithful application of *Boumediene* compels us to provide Guantanamo detainees the fundamental procedural protections that characterized the Great Writ in 1789. *Id.* at 522-23 (Griffith, J., dissenting); *see also INS v. St. Cyr*, 533 U.S. 289, 301 (2001) ("[A]t an absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789' . . . ." (quoting *Felker v. Turpin*, 518 U.S. 651, 663-64 (1996))). Among those procedural safeguards was the long-established right of a prisoner to question his jailer's authority to transfer him to a place where it would be difficult or impossible to execute the writ. *Boumediene*, 553 U.S. at 845-46 (Scalia, J., dissenting); *Kiyemba II*, 561 F.3d at 523 (Griffith, J., dissenting). *Kiyemba II* eviscerated that right by denying the detainees notice of transfers beyond the reach of the writ.

The court's reasoning was fundamentally flawed in at least two respects. First, the court failed to account for the right of a prisoner to challenge his transfer. Second, the court denied detainees the notice necessary to exercise this right based on the judgment that any transfer away from Guantanamo was likely to be lawful. In reaching that conclusion, the court misread then misapplied the Supreme Court's decision in *Munaf v. Geren*, 553 U.S. 674 (2008).

If *Kiyemba II* is allowed to stand, the government will be able to transfer detainees away from Guantanamo without affording them "a meaningful opportunity" to argue that the transfers would be

unlawful. *Boumediene*, 553 U.S. at 779. Such a practice would violate the habeas protections *Boumediene* conferred.

I

Since at least the seventeenth century, the writ of habeas corpus has guaranteed prisoners the very right the *Kiyemba II* court failed to protect: the right to challenge transfers beyond the reach of the writ. This element of habeas corpus developed as a means of preventing the King's officers from sending prisoners away to evade habeas jurisdiction. Justice Scalia described this component of the writ in his dissent in *Boumediene*: "The possibility of evading judicial review through such spiriting-away was eliminated, not by expanding the writ abroad, but by forbidding . . . the shipment of prisoners to places where the writ did not run or where its execution would be difficult." 553 U.S. at 845-46 (Scalia, J., dissenting).

In 1679, Parliament codified the habeas rights that had been developed at common law in what has come to be known as the Habeas Corpus Act of 1679, a legislative achievement that Blackstone described as the "stable bulwark of our liberties." 1 WILLIAM BLACKSTONE, COMMENTARIES *137. The full title of the Act acknowledged that protection from transfer beyond the writ's reach was an integral component of habeas corpus: "An Act for the better securing of the Liberty of the Subject and for the Prevention of Imprisonment beyond the Seas." 31 Car. 2, c. 2 (Eng.). With three limited exceptions,[1] prisoners entitled to invoke the writ

---

[1] The Act allowed transfers to places beyond the reach of the writ only if a prisoner had contracted to work abroad as an indentured servant, *id.* § 13, a court permitted a felon to choose transportation to a penal colony in lieu of execution, *id.* § 14, or the Crown transferred a prisoner to another of the King's dominions to be tried for a crime he was alleged to have committed there, *id.* § 16.

could not be transferred "beyond the seas" or to any other place where it would be difficult to execute the writ. *Id.* § 12 ("[N]o subject . . . may be sent prisoner into Scotland, Ireland, Jersey, Guernsey, Tangier, or into any parts, garrisons, islands, or places beyond the seas which are or at any time hereafter shall be within or without the dominions of his Majesty . . . and . . . every such imprisonment is hereby . . . illegal . . . ."). A jailer who violated this ban on unlawful transfers could be imprisoned, fined upwards of five hundred pounds payable to the prisoner, and "disabled from thenceforth [bearing] any office of trust or profit" in England or any of the King's other dominions. *Id.* The 1679 Act allowed prisoner transfers within England, but only in specifically enumerated circumstances.[2] A jailer who transferred a prisoner under other circumstances was subject to punishment. *Id.* § 9.[3]

---

[2] The relevant portion of the Act provided: "[I]f any person . . . shall be committed to any prison or in custody of any officer . . . whatsoever for any criminal . . . matter . . . the said person shall not be removed from the said prison and custody into the custody of any other officer . . . unless it be by habeas corpus or some other legal writ or where the prisoner is delivered to the constable . . . to carry such prisoner to some common jail or where any person is sent by order of any Judge of Assize or Justice of the Peace to any common . . . house of correction or where the prisoner is removed from one prison . . . to another within the same county in order to his or her trial or discharge in due course of law or in case of sudden fire or infection or other necessity . . . ." *Id.* § 9.

[3] A jailer who repeatedly defied the Act and transferred prisoners outside these enumerated scenarios was subject to a two hundred pound fine and "made incapable to hold or execute his . . . office" any further. *Id.* § 5.

Concern over unlawful transfers had been voiced in Parliament some years before the Act. For example, in 1667 Lord Chancellor Edward Hyde was impeached in part because he had "advised and procured divers of his Majesty's subjects to be imprisoned against law, in remote islands, garrisons, and other places, thereby to prevent them from the benefit of the law." 6 COBBETT'S COMPLETE COLLECTION OF STATE TRIALS 330 (Thomas B. Howell ed., London, R. Bagshaw 1816); *see also* ROBERT SEARLES WALKER, THE CONSTITUTIONAL AND LEGAL DEVELOPMENT OF HABEAS CORPUS AS THE WRIT OF LIBERTY 82 & n.151 (photo. reprint 2006) (1960) (describing the "practice of removing prisoners altogether out of the jurisdiction of the royal courts" as "absolutely fatal" to habeas corpus and "one of the principal charges" against Hyde). In 1669, Sir Anthony Cope took to the floor of the House of Commons to declare that he "[w]ould have no man out of the reach of Westminster-hall," the location from which the King's courts issued writs of habeas corpus. 1 ANCHITELL GREY, DEBATES OF THE HOUSE OF COMMONS 237 (London 1769). In turn, Sir Thomas Lee worried that "[h]e that is sent to Jersey or Guernsey," islands in the English Channel, "may be sent to Tangier," a more distant dominion, "and so never know what his crimes are, and no Habeas Corpus can reach him." *Id.*; *see also* Helen A. Nutting, *The Most Wholesome Law—The Habeas Corpus Act of 1679*, 65 AM. HIST. REV. 527, 534 (1960) (observing that proponents of what became the Habeas Corpus Act of 1679 "charged that men were being sent to the plantations and to Tangier so that writs from Westminster could not reach them").

By 1679, experience had taught that some limit on transfers was needed to prevent the King's officers from "avoiding the writ by moving the prisoners." WALKER, *supra*, at 84. In the notorious case of Robert Overton, the prominent parliamentarian was arrested for his part in a plot against the restored monarchy of Charles II and, in 1664, sent to the island of Jersey, *see* 42 OXFORD DICTIONARY OF NATIONAL BIOGRAPHY 174

(H.C.G. Matthews & Brian Harrison eds., 2004), a place where the authority of the writ was still very much in doubt, *see* PAUL D. HALLIDAY, HABEAS CORPUS: FROM ENGLAND TO EMPIRE 227-28 (2010) (describing a Jersey prisoner's unsuccessful attempt to invoke the writ in the 1650s). King's Bench, the common law court that issued the writ most often, sent multiple writs to Overton's Jersey jailers, but for seven years they refused to give any return. *Id.* at 267-68, 437 n.33. The 1679 Act was designed to protect prisoners like Overton by expressly prohibiting the King's officers from sending prisoners to Jersey or any other place where it was difficult to execute the writ. *See* 31 Car. 2, c. 2, § 12.

English cases from this time and over the next century demonstrate that courts readily exercised their power to review the lawfulness of transfers beyond the reach of the writ. In 1677, the Crown twice imprisoned Robert Murray for defamation and other crimes, and both times the King's Bench ordered his release to prevent his deportation to Scotland, where the writ did not run. HALLIDAY, *supra*, at 236 (discussing *Murray's Case*). During the second half of the eighteenth century, habeas courts regularly ordered the release of wrongfully impressed seamen rather than permitting the King's navy to take them abroad. Paul D. Halliday & G. Edward White, *The Suspension Clause: English Text, Imperial Contexts, and American Implications*, 94 VA. L. REV. 575, 605 & n.72 (2008). And in a celebrated case that foreshadowed the abolition of slavery in England, Lord Mansfield issued the writ to stop the transportation of an African bound to slavery in Jamaica, where the writ could not help him. *Somerset v. Stewart*, (1772) 98 Eng. Rep. 499 (K.B.); 20 How. St. Tr. 1, 79-82; *see also King v. Inhabitants of Thames Ditton*, (1785) 99 Eng. Rep. 891 (K.B.) 892; 4 Dougl. 300, 301 (Mansfield, J.) (observing in a habeas suit that even if slavery were legal in England, a slave owner could not "by force compel [a slave] to go out of the kingdom"); HALLIDAY, *supra*, at 274 (noting that while white Jamaicans could invoke the writ by this time, "habeas corpus would never

be available to their slaves"); Daniel J. Hulsebosch, *Nothing But Liberty:* Somerset's Case *and the British Empire*, 24 LAW & HIST. REV. 647, 657 (2006) (observing that the rule of *Somerset* did not apply to slaves in Jamaica).

The power of a court in habeas to pass on the lawfulness of transfers was part of the reception of English common law in the American colonies. *See* A.H. Carpenter, *Habeas Corpus in the Colonies*, 8 AM. HIST. REV. 18, 26 (1902) (explaining how, even in the absence of statutory habeas, the common law extended the writ to the American colonies). Around the time of the Founding, many of the original thirteen states enacted habeas laws that either expressly adopted the 1679 Act or otherwise followed its prohibitions. *See, e.g.*, GA. CONST. art. LX (1777) ("The principles of the habeas-corpus act shall be a part of this constitution."); Act of Mar. 16, 1785, 1 MASS. GEN. LAWS ch. 72, § 10 (1823) (prohibiting "any person [from] transport[ing] . . . any subject of this Commonwealth . . . to any part or place without the limits of the same . . . except [if] such person be sent by due course of law, to answer for some criminal offense committed in some other of the United States of America"); Act of Mar. 11, 1795, § 11, DIGEST OF THE LAWS OF NEW JERSEY 378 (4th ed., Newark, Martin R. Dennis & Co. 1868) (providing that "no citizen of this state . . . may be sent prisoner to any place whatsoever out of this state" except where he is sent to another state to be tried for a crime he allegedly committed there); Act of Feb. 18, 1785, § 12, DIGEST OF THE LAWS OF PENNSYLVANIA 573 (7th ed., Philadelphia, Davis 1847) (imposing two hundred pound fine on anyone who transfers a prisoner without legal authority to do so); Act of 1779, 11 VA. STAT. 410 (Richmond, Cochran 1823) (prohibiting transfers of prisoners out of the state except "where the prisoner shall be charged by affidavit with treason or felony, alleged to be done in any of the other United States of America, in which . . . case he shall be sent thither in custody" by order of a Virginia court); *see also* Act of Dec. 12, 1712, 2 S.C. STAT. 399-

401 (Columbia, Johnston 1837) (adopting the Habeas Corpus Act of 1679). As evidenced by these laws, by the time Congress conferred habeas jurisdiction on the newly created lower federal courts in the Judiciary Act of 1789, § 14, 1 Stat. 73, 81, the right to challenge an unlawful transfer was an established and indispensable feature of the American law of habeas corpus.

American courts have always heard challenges to transfers that could deprive the prisoner of the benefits of habeas corpus. For example, in the nineteenth century, habeas courts in free states sometimes issued the writ to block a slave's forcible removal to a slave state. *See, e.g.*, *Commonwealth v. Aves*, 35 Mass. (18 Pick.) 193 (1836) (Shaw, C.J.); *Lemmon v. People*, 20 N.Y. 562 (1860); *see also* Dallin H. Oaks, *Habeas Corpus in the States—1776-1865*, 32 U. CHI. L. REV. 243, 279 & n.194 (1965) (citing additional cases). The exercise of this authority was sufficiently well known that in 1855 a ship captain docking in Cincinnati moved his human cargo across the river to the commonwealth of Kentucky to avoid an Ohio judge's issuance of the writ. *An Attempt to Detain Sixteen Slaves on a Writ of Habeas Corpus*, N.Y. TIMES, Mar. 23, 1855, at 5. As Chief Justice Shaw explained in *Aves*, unless some law authorized a slave's removal from the state, transfer was illegal and could be enjoined by a habeas court. 35 Mass. (18 Pick.) at 217 (holding that a habeas court could intervene to stop the transfer of slaves where "there [was] no law which [would] warrant . . . their forcible detention or forcible removal"); *see also State v. Hoppess*, 1 Ohio Dec. Reprint 105, 1845 WL 2675, at *11 (Ohio 1845) (observing that a habeas court may intervene to prevent a transfer where "there is no law authorizing the master to force [the slave] back to the state which recognizes and enforces the relation of master and slave"). The authority to enjoin unlawful transfers remains a feature of habeas jurisdiction in the modern era. *See Ex parte Endo*, 323 U.S. 283, 307 (1944) (observing that a habeas court may act to ensure that a prisoner's habeas rights are not "impaired or

defeated by the removal of the prisoner from the territorial jurisdiction of the District Court").

The right to challenge transfers was inherent in *Boumediene*'s extension of the protections of habeas corpus to the Guantanamo detainees. Of course, this right is meaningless if the detainee is not told where the government plans to send him. Nevertheless, the court in *Kiyemba II* gave the Executive permission to spirit away a detainee without warning, thereby denying him the protections of an essential component of the Great Writ and making the right to habeas corpus "subject to manipulation by those whose power it is designed to restrain." *Boumediene*, 553 U.S. at 766.

II

The *Kiyemba II* court based its decision on *Munaf v. Geren*, 553 U.S. 674, which held that a habeas court should not block the transfer to Iraqi authorities of two American citizens held in U.S. custody in Iraq on behalf of Iraq. *See Kiyemba II*, 561 F.3d at 516. But the *Kiyemba II* court overlooked a crucial distinction between *Munaf* and *Kiyemba II. Munaf* was about the lawfulness of a transfer, not about the procedures by which a transfer could be challenged. Whether the *Munaf* prisoners were entitled to notice was never at issue, because the prisoners already had notice of their proposed transfers and a meaningful opportunity to challenge them in an Article III court. By denying these fundamental procedural rights, *Kiyemba II* went well beyond the holding of *Munaf*.

The *Munaf* petitioners were American citizens who allegedly committed crimes in Iraq. Although the government of Iraq held "ultimate responsibility for [their] arrest and imprisonment," the petitioners were in the custody of the U.S. military because "many of Iraq's prison facilities ha[d] been destroyed." 553 U.S. at 680. They sought an injunction to keep them in U.S. custody on the grounds that a transfer to Iraqi custody would not only subject them to unfair prosecution, but would also

put them at risk of torture. *Id.* at 694. A unanimous Supreme Court rejected the petitioners' challenge on the merits. The Court reasoned that blocking the transfers would be an affront to Iraqi sovereignty. *Id.* After all, the petitioners had been accused of committing crimes in Iraq and were being held in that country on behalf of the Iraqi government. Furthermore, the petitioners' claims called on the judiciary to "second-guess" a determination by the political branches that torture at the hands of Iraq was unlikely. *Id.* at 702. Finally, the form of relief sought—continued detention to shelter the petitioners from foreign prosecution—was not traditionally available in habeas. *Id.* at 693.

In *Kiyemba II*, the detainees sought the notice that would give them a meaningful opportunity to object to a transfer that might be unlawful. In response, the government cautioned that judicial involvement in the transfer of the detainees away from Guantanamo would undermine sensitive negotiations with foreign states and adversely affect American foreign policy. In any event, the government asserted, it would not undertake any unlawful transfer from Guantanamo. Deferring to the Executive's judgment, the court concluded that the detainees had no right to know of their transfers in advance because they were unlikely to prevail on a claim that their transfers would be unlawful. *See* 561 F.3d at 514; *see also id.* at 516-17 (Kavanaugh, J., concurring).

Although *Munaf* and a host of other authorities urge deference to the Executive's considered judgment about sensitive foreign-policy matters, no case, and especially not *Munaf*, directs us to short-circuit the procedures habeas requires. In its Guantanamo cases, the Supreme Court has made clear that deference to the Executive on the merits of habeas petitions does not divest the judiciary of its duty to hear them. *See Boumediene*, 553 U.S. at 797; *see also Rasul v. Bush*, 542 U.S. 466, 487 (2004) (Kennedy, J., concurring). And while there is no question that our approach to the War on Terror "must pay keen attention to the particular burdens faced by the

Executive in the context of military action, it would turn our system of checks and balances on its head" to suggest that a prisoner with habeas rights "could not make his way to court with a challenge . . . simply because the Executive opposes making available such a challenge." *Hamdi v. Rumsfeld*, 542 U.S. 507, 536-37 (2004) (plurality opinion); *cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) (stating that "[a] seizure executed by the President pursuant to an Act of Congress would be supported by the strongest of presumptions and the widest of latitude of judicial interpretation" but would still be subject to judicial inquiry); *Afshar v. Dep't of State*, 702 F.2d 1125 (D.C. Cir. 1983) (holding that where a FOIA plaintiff seeks sensitive foreign-affairs information, the court should give "substantial weight" to a government affidavit that the information is exempt from FOIA but nevertheless consider contrary evidence presented by the plaintiff).

In *Munaf*, the fact that "the political branches are well suited to consider" sensitive foreign-policy matters was a reason to give substantial weight to their views on the merits, 553 U.S. at 702, but it was not a reason to bar the courthouse door. The petitioners in *Munaf* lost their challenge to the lawfulness of their transfers, but only after having notice of the place the government wanted to send them and an opportunity to object. The petitioners in *Kiyemba II* sought the same notice and opportunity to object, and the court should have granted them.

In relying on *Munaf*'s treatment of the merits of a transfer claim, the *Kiyemba II* court was fundamentally confused. Notice is a necessary element of the right to challenge a transfer, and this right does not depend on whether the challenge is likely to succeed. By holding otherwise, the *Kiyemba II* court put the detainee in an impossible position: To receive notice of a transfer, he must first show that it is likely unlawful. But he cannot make that showing without knowing any details of his transfer except that he might be sent some day to some

place for some reason. This Catch-22 eliminates any "meaningful opportunity" to challenge a transfer. *Boumediene*, 553 U.S. at 779. In the more familiar context of the Due Process Clause, a defendant who is unlikely to prevail is still entitled to know he has been sued. *See Wuchter v. Pizzutti*, 276 U.S. 13, 19 (1928) (requiring that defendant receive notice of lawsuit without regard to merits of suit). Similarly, Guantanamo detainees are entitled to notice of a transfer regardless of how likely they are to persuade a court the transfer would be unlawful.

It is no response to say that the right to challenge transfers away from Guantanamo is a mere formality. Indeed, the court in *Kiyemba II* allowed for the possibility that some transfers could be unlawful. *See Kiyemba II*, 561 F.3d at 514 n.5, 516 n.7; *id.* at 521 n.7 (Kavanaugh, J., concurring); *see also Al Maqaleh v. Gates*, 605 F.3d 84, 98 (D.C. Cir. 2010) ("We do not ignore the arguments of the detainees that the United States chose the place of detention and might be able to evade judicial review of Executive detention decisions by transferring detainees into active conflict zones, thereby granting the Executive the power to switch the Constitution on or off at will." (internal quotation marks omitted)). A challenge to a transfer might succeed if, for example, we had "reason to think the transfer process may be a ruse . . . designed to maintain control over the detainees beyond the reach of the writ." *Kiyemba II*, 561 F.3d at 516 n.7.

In the end, I do not disagree that the detainees face a high bar in demonstrating that their transfers would be illegal. But that is beside the point. The question we face today is whether Guantanamo detainees are entitled to notice of a transfer beyond the reach of the writ. If it seems odd that detainees in the War on Terror should enjoy such a right, they do so only because *Boumediene* extended habeas corpus to Guantanamo. We are bound to accept the consequences of that decision. For that reason, I respectfully dissent from the denial of en banc hearing.